# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Madison Miracle Productions, LLC v. MGM Distribution Co., 2012 IL App (1st) 112334**

---

| | |
|---|---|
| Appellate Court Caption | MADISON MIRACLE PRODUCTIONS, LLC, and PARADISE FILM PRODUCTION COMPANY, INC., Plaintiffs-Appellees, v. MGM DISTRIBUTION COMPANY, Defendant-Appellant (Metro-Goldwyn-Mayer Studios, Inc., Defendant). |
| District & No. | First District, First Division<br>Docket No. 1-11-2334 |
| Filed | September 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over a contract to distribute a movie produced by plaintiffs, the denial of defendant's motion to dismiss the action for lack of personal jurisdiction pursuant to the long-arm statute was reversed on the ground that due process was not satisfied where defendant had insufficient minimum contacts with Illinois considering the factors of contract initiation, negotiation, formation and contemplated performance and the parties' course of dealing. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-7934; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | SNR Denton US LLP, of Chicago (Bernard J. Nussbaum and Natalie J. Spears, of counsel), and Sheppard Mullin Richter & Hampton LLP, of Los Angeles, California (Martin D. Katz, *pro hac vice*, and Dylan J. Price, *pro hac vice*, of counsel), for appellant. |
|---|---|
| | Sperling & Slater, P.C., of Chicago (Greg Shinall, Scott F. Hessell, and Eamon P. Kelly, of counsel), and Michael A. Maciejewski & Associates, of Elmhurst (Michael A. Maciejewski, of counsel), for appellees. |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs, Madison Miracle Productions, LLC (Madison LLC), and Paradise Film Production Company, Inc. (Paradise), filed the instant suit seeking both damages for breach of contract and an accounting against defendant-appellant, MGM Distribution Company (MGM Distribution), and defendant, Metro-Goldwyn-Mayer Studios, Inc. (MGM Studios). Plaintiffs' suit generally alleged that defendants failed to properly distribute "Madison" (the movie), a motion picture produced by Madison LLC. MGM Distribution, a Delaware corporation with its principal place of business in California, filed a motion to dismiss for lack of personal jurisdiction. That motion was denied by the trial court following an evidentiary hearing, and this court subsequently granted MGM Distribution's petition for leave to appeal that decision pursuant to Illinois Supreme Court Rule 306(a)(3). Ill. S. Ct. R. 306(a)(3) (eff. Feb. 16, 2011). For the reasons that follow, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3    Madison LLC and Paradise filed their initial complaint in July of 2009. With respect to the parties, the complaint alleged that: (1) Madison LLC was a California limited liability corporation, while all of Madison LLC's members were "citizens of and domiciled in Illinois"; (2) Paradise was a Delaware corporation with its principal place of business in California; and (3) both MGM Distribution and MGM Studios were Delaware corporations with their headquarters located in California.

¶ 4    As to the merits, the initial complaint generally alleged that "Madison" was a movie shot on location in Indiana, Illinois, Washington, and California in 1999. The movie was

produced by Madison LLC at a total cost in excess of $15 million. After the movie was screened at a film festival in 2001, Paradise expressed interest in distributing the movie on behalf of Madison LLC.

¶ 5    Specifically, in exchange for a fee, Paradise would arrange for the movie to be distributed by MGM Distribution. That distribution would take place pursuant to a preexisting "Distribution 'Put' Agreement" between Paradise and MGM Distribution. That agreement, executed in 1999, required MGM Distribution to accept up to six movies submitted by Paradise for distribution within the following five years. Such distribution could include arranging for an initial theatrical release, nationwide or internationally, and further distribution through other media outlets such as television, pay-per-view services, home video media (DVDs), and performances on airlines and cruise ships. Generally speaking, the agreement required MGM Distribution to "distribute each Picture in a commercially reasonable manner, consistent with the manner in which it distributes its own product of similar nature and quality."

¶ 6    The complaint alleged that Madison LLC agreed with Paradise's distribution proposal, and MGM Distribution in turn agreed to accept "Madison" as one of the six movies it was obligated to distribute pursuant to its distribution agreement with Paradise. These various agreements were memorialized in writing via: (1) the original 1999 distribution agreement between MGM Distribution and Paradise (the distribution agreement); (2) a 2004 agreement between Paradise and Madison LLC whereby Paradise agreed to submit "Madison" to MGM Distribution (the Paradise-Madison LLC agreement); and (3) a 2004 "PRODUCER/MGM P&A FUNDING AND DISTRIBUTION AGREEMENT" (the MGM-Madison LLC agreement) between MGM Distribution, Madison LLC, and Paradise, whereby MGM Distribution agreed to distribute "Madison" pursuant to its obligations under the original distribution agreement, and Madison LLC agreed to assume some of Paradise's obligations under that same agreement.

¶ 7    The complaint further alleged that while plaintiffs had fully performed their obligations under the contract, MGM[1] did not live up to its obligation to distribute "Madison" in a "commercially reasonable manner" either before or after the movie's theatrical release in April of 2005. Plaintiffs asserted that "the marketing, release and distribution of the film was horribly mismanaged and grossly substandard, the DVD release and distribution [were] disorganized and inept, [and] there was (and continues to be) utter confusion over who at MGM (or elsewhere) is handling international markets and media." Furthermore, plaintiffs contended that as a result of these failures, "a film which [Madison LLC] had invested $15 million to produce and market earned only $500,000 in box office sales–a small fraction of what Madison LLC reasonably would have been expected to earn had MGM met its obligations–and lost tens of millions of dollars in downstream royalties."

¶ 8    More specifically, the complaint alleged that–pursuant to the various agreements–Madison LLC had an obligation to both deliver the fully completed movie and

---

[1]Plaintiffs' initial complaint generally referred to both defendants, in an undifferentiated manner, as "MGM."

other materials to MGM in a specific format and to forward at least $1 million dollars (marketing funds) to MGM to be used for "Print & Advertising ('P&A') expenses" (marketing expenses). These marketing funds were to be used to support the initial theatrical release of "Madison." Nevertheless, Madison LLC had the option to provide additional marketing funds to MGM in order to support the movie's chances for greater commercial success, and the complaint asserted that Madison LLC did in fact provide a total of $6.75 million in such funding. Additionally, and in conformity with its contractual obligations, Madison LLC also created a "Marketing, Promotion and Publicity Plan" (marketing plan) for the movie outlining how MGM should utilize the marketing funds provided. After completing its obligations, Madison LLC was entitled to the net proceeds that the movie generated from the exploitation of the movie through all of MGM's various distribution channels.

¶ 9 With respect to MGM, the complaint asserted that–in exchange for a percentage of the gross receipts generated by the movie–MGM was obligated to distribute "Madison" as it would one of its own films. The initial theatrical release would be in conformity with the marketing plan developed by Madison LLC, with that plan to be negotiated by the parties and ultimately approved by MGM. MGM was to exercise its approval power "in good faith." MGM was also to distribute the movie through all of its other distribution channels following the initial release to theaters.

¶ 10 The complaint went on to allege that MGM breached its contractual obligations in many respects. Specifically, plaintiffs asserted that MGM: (1) refused to fully implement Madison LLC's proposed marketing plan, instead insisting on a "bare-bones release of Madison"; (2) insisted that the "iconic MGM logo" be removed from promotional materials that had already been prepared; (3) failed to ensure that promotional material and "trailers" for the movie were exhibited in movie theaters prior to the initial release in April of 2005; and (4) failed to coordinate with and otherwise frustrated a "grass roots" marketing and advance ticket purchase strategy separately arranged by Madison LLC. Plaintiffs contended that due to these failures, "Madison" was initially released "in only 15 markets on only 93 screens," the theatrical release only lasted 21 days, and the movie only generated some $517,000 in ticket sales. Plaintiffs also alleged that "[t]he low box office numbers, caused by MGM's failure to perform, substantially compromised [the movie's] downstream distribution through DVD, international and pay television."

¶ 11 Additional contractual breaches were alleged regarding MGM's actions with respect to those "downstream" distribution channels. Specifically, plaintiffs alleged that–due in part to confusion and mismanagement caused by various transitions in the defendants' overall corporate structure and changes in their distribution partners–MGM also failed to competently handle the distribution of the movie via DVD, national and international television broadcasts, and pay-per-view channels. These failures further contributed to the movie's lack of commercial success. Finally, plaintiffs alleged that MGM had failed to comply with certain accounting and auditing obligations contained in the parties' agreements, thus stymieing plaintiffs' efforts to determine both the scope of MGM's mismanagement and the amount of plaintiffs' actual losses.

¶ 12 Both defendants filed motions to dismiss plaintiffs' initial complaint, with MGM Studios

bringing its motion pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)). MGM Studios complained that plaintiffs' complaint improperly referred to defendants generally and nonspecifically as "MGM," and also failed to state a cause of action against MGM Studios because it was apparent from the agreements attached to the complaint that only MGM Distribution was a party to the operative agreements.

¶ 13    In turn, MGM Distribution filed a limited appearance and brought a motion to dismiss pursuant to section 2-301 of the Code (735 ILCS 5/2-301 (West 2010)). In that motion, MGM Distribution contended that subjecting it to suit in Illinois would violate its federal due process rights because it did not have sufficient "minimum contacts" with this state to support personal jurisdiction. MGM Distribution supported its motion by asserting that: (1) none of the parties involved in this suit, including plaintiffs, were Illinois corporations or residents; (2) the contracts involved were all negotiated and executed in California and MGM Distribution's obligations under those contracts were to be performed in California; and (3) while the *exhibition* of the movie would take place in Illinois (and elsewhere), all such activities were coordinated from California and carried out by independent third parties.

¶ 14    What followed was nearly two years of litigation with respect to defendants' motions to dismiss. During that time, the parties engaged in significant discovery on the jurisdictional issues, multiple affidavits and counteraffidavits were filed with the court, and plaintiffs twice filed amended complaints in an effort to better state a cause of action against MGM Studios upon various legal theories. These included allegations that MGM Studios directly participated in the contractual breaches alleged, MGM Studios should be held liable because it was the alter ego of MGM Distribution, and that Madison LLC was a third-party beneficiary of agreements between MGM Studios and MGM Distribution. In October of 2010, the trial court found that plaintiffs had made a *prima facie* case that Illinois courts had personal jurisdiction over MGM Distribution and scheduled an evidentiary hearing to resolve certain factual conflicts with respect to the jurisdictional issue.

¶ 15    That evidentiary hearing was ultimately held over the course of three days in July and August of 2011. During the hearing, the trial court heard testimony from the following individuals: (1) Mr. John Hester, an attorney and long-time "senior advisor" and consultant for both defendants; (2) Mr. Steve Stabler, the owner of Paradise; and (3) Mr. Carl Amari, the chairman of Madison LLC. The court was also presented with deposition testimony transcripts and other documentary evidence.

¶ 16    Mr. Hester testified that he had been a consultant for MGM Studios since 1997, and in that role he also provided services to MGM Studios' subsidiaries such as MGM Distribution. Mr. Hester was the person primarily responsible for negotiating both the distribution agreement and the MGM-Madison LLC agreement on behalf of MGM Distribution. The distribution agreement arose out of an employment agreement Mr. Stabler had with Orion Pictures, a company previously acquired by MGM Studios. That agreement allowed Mr. Stabler to "put" a certain number of movies to Orion Pictures for nearly mandatory distribution if he was ever terminated. When Mr. Stabler was subsequently terminated following MGM Studios' acquisition of Orion Pictures, the "put" agreement was triggered. Ultimately, this prior employment agreement was further negotiated by MGM Distribution and Mr. Stabler, and the result of that negotiation was the 1999 distribution agreement

executed between MGM Distribution and Paradise, Mr. Stabler's company. Mr. Hester testified that the distribution agreement was completely negotiated and executed in California, with both parties being Delaware corporations operating out of California.

¶ 17    Mr. Hester further testified that it was in May of 2004 that he first became aware that Paradise was interested in submitting "Madison" to MGM Distribution pursuant to the distribution agreement. Mr. Hester understood that Paradise and Madison LLC had reached an agreement to do so, but that Madison LLC was also interested in depositing the marketing funds required by the distribution agreement directly with MGM Distribution instead of funneling that money through Paradise. Mr. Hester testified that such a transaction would be a "deviation from the original distribution agreement," and since Madison LLC would therefore be assuming Paradise's obligation to pay for the marketing expenses required in the distribution agreement, that modification "had to be in writing." It was this requirement that led to the MGM-Madison LLC agreement being executed in 2004. Mr. Hester's testimony was that the discussions and negotiations with respect to that agreement occurred in California and involved: (1) himself; (2) another MGM Distribution employee, Mr. Erik Lomis; (3) Mr. Stabler; and (4) Madison LLC's California-based attorney, Mr. Tom Taylor.

¶ 18    While Mr. Amari signed the MGM-Madison LLC agreement in Illinois on behalf of Madison LLC, the agreement drafts–including the final draft–were always forwarded to him through Mr. Taylor in California. The final signatory was Mr. Lomis, who signed the agreement in California on behalf of MGM Distribution. Mr. Hester acknowledged that the MGM-Madison LLC agreement contained a notice provision requiring Madison LLC's notices to be sent to Mr. Amari in Illinois, but denied that MGM Distribution knew if Madison LLC had its principal place of business there. Mr. Hester was aware that many of the investors in the movie were from Illinois and Mr. Amari had an office there.

¶ 19    After the MGM-Madison LLC agreement was executed, Mr. Hester and others at MGM Distribution did engage in discussions and negotiations with Mr. Amari and some of the other Illinois investors in the movie. These discussions and negotiations involved how and where the movie would be initially marketed and released to theaters. Mr. Hester acknowledged that these discussions and negotiations took place pursuant to the requirement for an approved marketing plan referenced in both the distribution agreement and the MGM-Madison LLC agreement, and he described the process as "collaborative." While all such in-person meetings occurred in California, and no MGM Distribution employee ever traveled to Illinois for any reason, Mr. Hester testified that MGM Distribution did participate in telephone calls with Mr. Amari in Illinois. MGM Distribution also exchanged faxes and e-mails with Mr. Amari in Illinois, with those communications containing general correspondence and draft agreements. Mr. Hester denied that any conversations or negotiations with respect to the specific distribution of "Madison" occurred prior to the execution of the MGM-Madison LLC agreement in the summer of 2004.

¶ 20    Mr. Stabler testified that he was the sole owner of Paradise. He also testified regarding the history surrounding the execution of the distribution agreement, and his testimony on that topic generally corresponded with Mr. Hester's recollections. Mr. Stabler further testified that the distribution agreement was "unique" and a "great opportunity" because it required MGM Distribution–one of the six major movie studios–to distribute the independently

produced and financed movies submitted under the agreement "in no way different than they would distribute any of their own films." Mr. Stabler testified that this was important for many reasons, including the fact that "the studios control the bulk of distribution in the film business and they generally have output deals for both home entertainment and for domestic and international television that are far in excess of the output amounts that any independent sales organization could get from the films." The distribution agreement thus allowed Paradise to make use of MGM Distribution's "distribution system and to take advantage of the output deals they've negotiated."

¶ 21    Mr. Stabler first agreed to submit "Madison" to MGM Distribution under the distribution agreement in the late summer of 2003. In making that decision, he discussed the matter with Mr. Amari, who was based out of Illinois. Mr. Amari was the head of Madison LLC and the ultimate decision maker with respect to the distribution of the movie. He then reached out to Mr. Lomis, the president of distribution for MGM Distribution, who soon indicated that "Madison" would be accepted for distribution pursuant to the distribution agreement. Over the course of the next few months, Mr. Stabler, Mr. Lomis, and Mr. Hester engaged in "many" additional discussions in California regarding the exact way the movie would ultimately be distributed. Mr. Amari himself was only involved in some of Mr. Stabler's conversations with Mr. Hester, with Mr. Stabler establishing a conference call from California to Mr. Amari in Illinois.

¶ 22    During the course of those negotiations, MGM Distribution became aware that Mr. Amari operated out of Illinois and that Mr. Stabler–who described his role as that of a "middleman"–would often have to ask Mr. Amari for direction before relaying that information to MGM Distribution. MGM Distribution was also made aware of the fact that Chicago would be an important market for the initial theatrical release of "Madison," both because it was the third largest market in the country and because it was important to Mr. Amari that the other Illinois investors in Madison LLC would be able to view the movie in theaters there. These discussions ultimately led to the execution of the MGM-Madison LLC agreement in the summer of 2004.

¶ 23    Mr. Amari testified that he was the chairman of Madison LLC and the lead producer of the movie. In those roles, Mr. Amari testified that he "raised the majority of the money and cast everybody with the help of a casting director and hired the production team and hired the director, all–the cinematographer and everyone associated with producing the movie and then continued to be the decision-maker on the film and its distribution throughout until current." The vast majority of those decisions–and all of those decisions regarding distribution–were made by Mr. Amari, and the vast majority of those decisions were made at Madison LLC's principal offices in Illinois. That is also where Mr. Amari received telephone calls, general correspondence, and other notices from MGM Distribution regarding the movie. All of the investors in and members of Madison LLC, including Mr. Amari himself, were Illinois residents.

¶ 24    Mr. Amari ultimately decided to submit the movie for distribution through Paradise's distribution agreement with MGM Distribution. However, Mr. Amari specifically testified that Madison LLC never pressed for a direct contractual relationship with MGM Distribution and that he would have been content to pay MGM Distribution the required marketing funds

directly without such a relationship. He also testified that he and the other Madison LLC investors traveled to California in December of 2004 in an effort to obtain as wide a theatrical release of the movie as possible. Mr. Amari and his investors had spent over $15 million on producing the film, and they felt that the only way to recoup that investment was to promote the movie to as wide an audience as possible. As such, they were prepared to spend far more than the $1 million in marketing expenses required by the MGM-Madison LLC agreement, and in the end actually spent over $5 million marketing the movie. It was also very important that the movie be distributed in Chicago, and Mr. Amari informed MGM Distribution of that fact. Despite this, MGM Distribution itself was unwilling to support a wider release and proposed a more limited initial theatrical distribution of the movie.

¶ 25    Mr. Amari did allow that Mr. Bill Bindley, the California-based director of the movie, had some authority to make decisions and hire some personnel with respect to the creative aspects of the film. He also testified that various pre- and postproduction offices were set up in California in order to expedite the completion of the movie, which was also partially filmed in California. Additionally, Mr. Amari admitted that Madison LLC was organized in California and certain organizing documents listed its principal place of business to be in that state. However, Mr. Amari testified that the movie was initially produced via another more generalized Illinois corporation and that Madison LLC was subsequently organized to provide an investment vehicle that was solely focused on the production of "Madison." That process was completed by Madison LLC's attorney, Mr. Taylor, and Mr. Amari was not certain exactly why California was chosen as the place of organization. Moreover, Mr. Amari reiterated that it was Illinois where he made all of the distribution decisions with respect to the movie on behalf of Madison LLC. He did acknowledge that Madison LLC's offices in Illinois were primarily located in an office he personally owned and that Madison LLC never had a lease for the space he used for its activities there.

¶ 26    As noted above, the trial court was also presented with a number of deposition transcripts, which included the deposition testimony of: (1) Mr. William Bindley, the California-based director of "Madison"; (2) Mr. Tom Taylor, Madison LLC's California-based attorney; (3) Mr. Stephan Manpearl, Madison LLC's California-based distribution and marketing consultant; and (4) Mr. Carrey, a California-based employee of Madison LLC who supervised various postproduction activities for the movie. These witnesses testified regarding their respective involvement in the production, postproduction, marketing, and distribution of the movie, and generally testified that their involvement in the project occurred in California. There were some exceptions to this, as Mr. Bindley was involved in the filming of the movie in Illinois and Indiana and Mr. Manpearl testified that he did attend some meetings with Madison LLC in Illinois. However, they all also generally testified that most–if not all–major decisions regarding Madison LLC and the movie were made by Mr. Amari and the other investors in Illinois, and that MGM Distribution was well aware of that fact.

¶ 27    Finally, the parties also presented documentary evidence to the trial court. These documents included the various contractual agreements at issue, correspondence, and documents related to the organization of Madison LLC and the production and marketing of "Madison." Of particular note, defendants introduced documents showing that Madison LLC

was originally organized in California, California was originally identified as its principal place of business, and Mr. Bindley–a California resident–had at various times been identified as the president of the company as well as a member. MGM Distribution also produced evidence that Madison LLC was not registered to do business in Illinois. In turn, plaintiffs introduced documents showing that Illinois had been identified as Madison LLC's principal place of business on at least one of its agreements with MGM Distribution, MGM Distribution often communicated with Madison LLC in Illinois, and that–while "Madison" was initially released in 15 states–25% of the initial marketing expenses were spent in Illinois (more than in any other state) and Illinois was the location of over 10% of the screens upon which "Madison" was initially exhibited.

¶ 28    At the conclusion of the hearing, the trial court concluded that it was proper to exercise personal jurisdiction over MGM Distribution in light of its contacts with Illinois. The trial court specifically noted that MGM Distribution entered into a contract with Madison LLC to distribute the movie and that the performance of that contract "was substantially connected with the State of Illinois." This conclusion was based on the following factual findings: (1) the movie was intended to be a "limited release movie," with a broader release contingent upon initial commercial success; (2) Illinois was disproportionally targeted as part of that initial limited release; (3) Illinois is where Madison LLC's investors and its chief executive lived, and MGM Distribution was aware of this fact; (4) the movie was partially filmed in Illinois; and (5) Illinois was the third largest movie theater market in the country. The trial court also noted that MGM Distribution would be compensated for its distribution of the movie. Ultimately, the trial court stated:

> "Under these circumstances, I conclude that MGM Distribution clearly availed itself of the benefits and protections of the laws of the State of Illinois. By marketing and distributing the film heavily in Illinois, MGM should have reasonably anticipated being haled into court on this date."

¶ 29    The trial court also granted, without prejudice, MGM Studio's motion to dismiss plaintiffs' second amended complaint. The record reflects that plaintiffs subsequently filed a third amended complaint following the evidentiary hearing. For its part, MGM Distribution filed a timely petition for leave to appeal the trial court's decision pursuant to Illinois Supreme Court Rule 306(a)(3). Ill. S. Ct. R. 306(a)(3) (eff. Feb. 16, 2011). This court granted MGM Distribution's petition on November 2, 2011.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, MGM Distribution contends that the trial court improperly denied its motion to dismiss for lack of personal jurisdiction. We agree.

¶ 32                                A. Standard of Review

¶ 33    As an initial matter, the parties dispute the proper standard of review applicable after a trial court conducts an evidentiary hearing on the matter of personal jurisdiction. MGM Distribution contends that we should review the trial court's denial of its motion to dismiss *de novo*, as this appeal merely involves a review of the trial court's application of settled law

to uncontested facts. Plaintiffs assert that when–as is the case here–the trial court holds an evidentiary hearing on the issue of personal jurisdiction, we should reverse only if the trial court's ultimate decision is against the manifest weight of the evidence. Neither side is entirely correct.

¶ 34    It is well understood that a plaintiff "bears the burden of making a *prima facie* showing that the trial court has personal jurisdiction over a nonresident defendant." *McNally v. Morrison*, 408 Ill. App. 3d 248, 254 (2011). "To determine whether the plaintiff has set forth a *prima facie* case for jurisdiction, the trial court must consider the uncontroverted pleadings, documents and affidavits, as well as any facts asserted by the defendant that have not been contradicted by the plaintiff." *Cardenas Marketing Network, Inc. v. Pabon*, 2012 IL App (1st) 111645, ¶ 28. When the trial court bases its decision solely on such documentary evidence, we review a trial court's dismissal of a case for lack of personal jurisdiction *de novo*. *McNally*, 408 Ill. App. 3d at 254.

¶ 35    If any material evidentiary conflicts exist, however, the trial court must conduct an evidentiary hearing to resolve those disputes. *Russell v. SNFA*, 408 Ill. App. 3d 827, 830-31 (2011); *TCA International, Inc. v. B&B Custom Auto, Inc.*, 299 Ill. App. 3d 522, 531-32 (1998) ("if there are disputes regarding issues of fact which 'determine whether the court has personal jurisdiction, the trial court must hear the testimony, evaluate its credibility, and resolve any material conflicts in the evidence' " (quoting *Stein v. Rio Parismina Lodge*, 296 Ill. App. 3d 520, 523 (1998))). As any number of decisions have held over the years, a manifest weight of the evidence standard has historically been applied by appellate courts when the trial court conducts such an evidentiary hearing and hears testimony on jurisdictional issues. *Royal Extrusions Ltd. v. Continental Window & Glass Corp.*, 349 Ill. App. 3d 642, 645 (2004); *TCA International, Inc.*, 299 Ill. App. 3d at 532; *Ruprecht Co. v. Sysco Food Services of Seattle, Inc.*, 309 Ill. App. 3d 113, 119 (1999); *Gaidar v. Tippecanoe Distribution Service, Inc.*, 299 Ill. App. 3d 1034, 1039-40 (1998). Under this standard, this court should reverse a trial court's determination "only when the opposite conclusion is clearly evident or where the factual findings upon which it is based are unreasonable, arbitrary, or not based on the evidence." *1350 Lake Shore Associates v. Randall*, 401 Ill. App. 3d 96, 102 (2010). These decisions do not address whether this standard should apply equally to the trial court's findings of fact and its conclusions of law following an evidentiary hearing.

¶ 36    However, the Second District of the Illinois Appellate Court has held that a "clearly erroneous" standard should apply to jurisdictional rulings that follow an evidentiary hearing. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004); *People ex rel. Waller v. Harrison*, 348 Ill. App. 3d 976, 979-80 (2004). In *Harrison*, the court noted that where a trial court conducts a hearing, is presented with disputed evidence, makes findings of fact, and ultimately applies legal principles to those factual findings, the resolution of a jurisdictional issue presents "a mixed question of law and fact" to which a "clearly erroneous" standard of review should apply. *Id.* at 979.

¶ 37    This court is unaware of any other decision applying a clearly erroneous standard in the context of a trial court's ruling on the issue of personal jurisdiction following an evidentiary hearing. Moreover, the clearly erroneous standard has typically been applied to the review

-10-

of mixed questions of fact and law arising out of administrative proceedings, pursuant to the Administrative Review Law (735 ILCS 5/3-110 (West 2010)) and in light of the deference afforded to the highly specialized and technical expertise of administrative agencies (*AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 394-96 (2001); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). Indeed, our supreme court has "cited the clearly erroneous standard of review only in cases governed by the Administrative Review Law" and indicated that it has "limited the application of that standard to reviewing administrative decisions on mixed questions of fact and law." *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 542 (2007).[2] As the supreme court went on to note, "[i]n all other civil cases, we review legal issues *de novo* and factual issues under a manifest weight of the evidence standard." *Id.*

¶ 38    The appropriate standard of review in situations that involve underlying determinations of both factual and legal issues is a question that has been the subject of a great deal of attention and analysis. See Kathleen L. Coles, *Mixed Up Questions of Fact and Law: Illinois Standards of Appellate Review in Civil Cases Following the 1997 Amendment to Supreme Court Rule 341*, 28 S. Ill. U. L.J. 13 (2003); Timothy P. O' Neill & Susan L. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512 (1995); Timothy P. O'Neill, *Standards of Review in Illinois Criminal Cases: The Need for Major Reform*, 17 S. Ill. U. L.J. 51 (1992). At this point, the question appears to remain somewhat unsettled.

¶ 39    In such an environment, we find it most appropriate to follow our supreme court's direction; *i.e.*, in "civil cases, we review legal issues *de novo* and factual issues under a manifest weight of the evidence standard." *Samour*, 224 Ill. 2d at 542. As such, because the trial court in this case held an evidentiary hearing on the issue of personal jurisdiction and made factual findings, we will review any of its relevant factual findings deferentially under the manifest weight of the evidence standard. However, the trial court's legal conclusions–including its conclusions regarding the legal effect of its own factual findings and its ultimate resolution of the issue of personal jurisdiction–will be reviewed *de novo*.[3]

_____

[2]Despite this clear statement of intent, the supreme court has in fact applied this standard in at least one other context. See *People v. Davis*, 233 Ill. 2d 244, 261-62 (2009) (applying clearly erroneous standard to a trial court's factual and legal findings with respect to allegations of discrimination in jury selection).

[3]Appellate review following an evidentiary hearing on the issue of personal jurisdiction should therefore essentially follow the procedure our supreme court has established for appellate review of a trial court's resolution of a motion to transfer based upon improper venue. In *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 153-54 (2005), our supreme court held: "The determination of proper statutory venue raises separate questions of fact and law because it necessarily requires a trial court to rule on the legal effect of its factual findings. In other words, after first examining the facts of the case, the trial court must then determine whether the venue statute is satisfied. The inquiry thus requires a two-step analysis. First, the trial court's underlying factual findings are reviewed deferentially. A trial court's findings of fact will not be disturbed on review unless those findings are against the manifest weight of the evidence. [Citation.] Second, the trial court's

¶ 40                              B. General Legal Framework

¶ 41        We now turn to the general legal principles applicable to our consideration of whether the courts of this state have personal jurisdiction over MGM Distribution.

¶ 42        Traditionally, our resolution of this question would involve a three-part analysis involving a consideration of "whether the assertion of jurisdiction comports with the Illinois long-arm statute, the due process guarantee of the United States Constitution, and the constraints imposed by the Illinois Constitution's due process guarantee." *Viktron Ltd. Partnership v. Program Data Inc.*, 326 Ill. App. 3d 111, 117 (2001). However, that three-part analysis can be substantially collapsed in this case.

¶ 43        First, we note that the Illinois long-arm statute–the common name given to section 2-209 of the Code of Civil Procedure (735 ILCS 5/2-209 (West 2010))–contains a number of enumerated acts by which a nonresident defendant is deemed to subject itself to the jurisdiction of the courts in this state. However, section 2-209 now also contains a so-called "catchall provision" providing that a "court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2010). As courts have previously recognized:

    "[W]ith the enactment of subsection (c), the long-arm statute has been held to be coextensive with the due process requirements of the Illinois and United States Constitutions. [Citation.] Further, subsection (c) provides an independent basis for exercising personal jurisdiction. [Citation.] If both the federal and Illinois due process requirements for personal jurisdiction have been met, the Illinois long-arm statute is satisfied and no other inquiry is required. [Citation.]

    Because of the coextensive nature of the long-arm statute and due process requirements, the first step traditionally employed by Illinois courts in personal jurisdiction analysis, that is, whether the defendant performed any of the acts enumerated in the long-arm statute, is now 'wholly unnecessary.' [Citation.] In other words, the long-arm statute is satisfied when due process concerns are satisfied, regardless of whether the defendant performed any of the acts enumerated in the long-arm statute. [Citation.]"
    *Keller v. Henderson*, 359 Ill. App. 3d 605, 612 (2005).

Conversely, if the requirements of due process are not satisfied, then personal jurisdiction under the long-arm statute is not permitted. *Hanson v. Ahmed*, 382 Ill. App. 3d 941, 943 (2008) ("The purpose of the Illinois long-arm statute is to assert jurisdiction over nonresidents to the extent permitted by the due process clause. [Citation.] Thus, the reach of the long-arm statute may lie within or may touch, but cannot extend beyond, the bounds circumscribed by the requirements of due process.").

¶ 44        Second, "[o]ur supreme court has held that the Illinois Constitution contains an independent guarantee of due process separate from its federal counterpart. [Citation.] However, it is generally true that, when federal due process concerns regarding personal

conclusion of law is reviewed *de novo*. [Citation.]"

jurisdiction are satisfied, so are Illinois due process concerns." *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 13. Here, neither party has raised any assertion that the relevant due process concerns and analysis applicable to this case under the Illinois Constitution diverge in any way from the due process concerns and analysis applicable under our federal constitution. As such, we need only consider the relevant federal due process standards. *Id.*; *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 22.

¶ 45    Third, we note that a court may typically exercise either general or specific personal jurisdiction over a nonresident defendant. While general jurisdiction can be found when a defendant has continuous and systematic general business contacts with the forum, a court has specific jurisdiction over a defendant only if the suit arises out of or relates to the defendant's contacts with the forum state. *Bolger v. Nautica International, Inc.*, 369 Ill. App. 3d 947, 951-52 (2007). In this case, plaintiffs asserted in the trial court that MGM Distribution was subject to both general and specific jurisdiction. However, the trial court found that it did not have general jurisdiction over MGM Distribution and no party has challenged that decision before this court.

¶ 46    Thus, the jurisdictional issue raised on appeal in this case resolves into a single narrow question, *i.e.*, whether the assertion of specific jurisdiction over MGM Distribution in this case comports with the requirements of federal due process.

¶ 47             C. General Federal Due Process Requirements

¶ 48    As has been previously recognized:

" 'The United States Supreme Court has determined that a state's power to invoke personal jurisdiction over a nonresident defendant is limited by the due process clause of the fourteenth amendment [citation].' [Citation.] 'The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." ' [Citation.] 'The due process clause [thus] limits a state's exercise of personal jurisdiction over a nonresident defendant to those instances where the defendant had at least "minimum contacts" with the state.' [Citation.] The minimum-contacts standard ensures 'that a nonresident will not be haled into a forum solely as a result of random, fortuitous, or attenuated contacts with the forum or the unilateral acts of a consumer or some other third person.' [Citation.]" *Higgins v. Richards*, 401 Ill. App. 3d 1120, 1123 (2010).

Thus, federal due process requires that a "nonresident defendant must have 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' [Citation.]" *Kalata v. Healy*, 312 Ill. App. 3d 761, 768 (2000).

¶ 49    Three requirements are considered in determining if the federal due process standard has been satisfied when a court attempts to assert specific jurisdiction over a nonresident defendant. These include whether: (1) the nonresident defendant had sufficient "minimum contacts" with the forum state such that there was "fair warning" that the defendant might be haled into the forum court; (2) the action arose out of or was related to the defendant's contacts with the forum state; and (3) it is reasonable to require the defendant to litigate in

the forum state. *Id.* at 768-69; *Viktron*, 326 Ill. App. 3d at 120-21.

¶ 50                                    D. Minimum Contacts

¶ 51    Thus, we must begin by considering whether MGM Distribution had sufficient minimum contacts with Illinois such that the exercise of specific personal jurisdiction in this case comports with the requirements of federal due process.

¶ 52                        1. Legal Test for Minimum Contacts

¶ 53    As the United States Supreme Court has recognized, "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' [Citation.] 'Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.' [Citation.]" (Emphasis in original.) *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 109 (1987). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985) (quoting *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957)). Still, personal jurisdiction should be exercised only where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

¶ 54    Where a state seeks to assert jurisdiction over a nonresident defendant in a contract dispute, "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." *McGee*, 355 U.S. at 223. However, a contract with a nonresident defendant is not *alone* sufficient to establish that a defendant has minimum contacts with a plaintiff's home forum. *Burger King Corp.*, 471 U.S. at 478. Therefore, "[i]n order to determine whether sufficient minimum contacts exist to support personal jurisdiction, we do not focus on the mere existence of a contract between the parties, nor on the place of contracting or of performance. [Citation.]" *Commerce Trust Co. v. Air 1st Aviation Cos.*, 366 Ill. App. 3d 135, 143 (2006). The United States Supreme Court:

> "[L]ong ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, [citation], or on 'conceptualistic ... theories of the place of contracting or of performance,' [citation]. Instead, [it has] emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' [Citation.] It is these factors–prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing–that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King Corp.*, 471 U.S. at 478-79.

¶ 55          2. MGM Distribution's Alternative Legal Test for Minimum Contacts

¶ 56     In light of the authority cited above, we must reject MGM's initial effort to limit our minimum contacts analysis to a specific four-factor test focusing on the initiation, negotiation, formation and anticipated performance of the agreements at issue in this case. In its briefs on appeal, MGM Distribution acknowledges the United States Supreme Court's rejection of "mechanical tests" for personal jurisdiction in favor a "highly realistic approach." Nevertheless, MGM Distribution insists that "there can be no question that the focus of the 'minimum contacts' inquiry must be on the initiation, negotiation, formation and contemplated performance of the contract in question."

¶ 57     In support of this argument, MGM Distribution cites to a number of cases purportedly standing for the proposition that–in conducting a federal due process analysis of a defendant's minimum contacts with the forum–to determine "whether the defendant sufficiently availed itself of the benefits of Illinois law in forming the contract with the Illinois resident, the court should consider the following: (1) who initiated the transaction; (2) where the contract was negotiated; (3) where the contract was formed; and (4) where performance of the contract was to take place." *Estate of Isringhausen v. Prime Contractors & Associates, Inc.*, 378 Ill. App. 3d 1059, 1065-66 (2008); see also *Wilson v. Liebel Holdings III, LLC*, 687 F. Supp. 2d 802, 806-07 (N.D. Ill. 2010); *Bolger*, 369 Ill. App. 3d at 952; *Ideal Insurance Agency, Inc. v. Shipyard Marine, Inc.*, 213 Ill. App. 3d 675, 680-81 (1991); *Gordon v. Tow*, 148 Ill. App. 3d 275, 280-81 (1986). However, a close inspection of these cases reveals that they do not support MGM Distribution's position.

¶ 58     To begin with, we again note that the Illinois long-arm statute includes a list of acts a nonresident defendant can take which will confer personal jurisdiction to the courts in this state. 735 ILCS 5/2-209 (West 2010). Among those acts is "[t]he transaction of any business within this State." 735 ILCS 5/2-209(a)(1) (West 2010). In interpreting this statutory provision, courts have traditionally recognized that the "determination of whether a defendant sufficiently transacted business in Illinois so as to avail himself of the benefits of Illinois law requires consideration of several factors, including who initiated the transaction, where the contract was entered into, and where the performance of the contract was to take place." *Ideal Insurance Agency*, 213 Ill. App. 3d at 680 (citing *Gordon*, 148 Ill. App. 3d at 280-81). Thus, the four-factor test MGM Distribution would have this court apply to our *constitutional* due process analysis began as a three-factor test applicable to *statutory* long-arm jurisdiction under section 2-209(a)(1) of the Code.

¶ 59     However, in *Viktron*, a nonresident defendant relied upon the *Ideal Insurance Agency* decision in arguing that the contract at issue was not substantially connected with this state under section 2-209(a)(7) of the Code. *Vicktron*, 326 Ill. App. 3d at 117; 735 ILCS 5/2-209(a)(7) (West 2010) (personal jurisdiction proper for any action arising out of the "making or performance of any contract or promise substantially connected with this State"). In that case, the Second District of the Illinois Appellate Court noted that its prior decision in *Ideal Insurance Agency*:

          "[S]et forth a multifactor test to assess whether the defendant's conduct relative to a contractual transaction was sufficient to establish that the defendant had transacted

business in Illinois. [Citation.] That case addressed section 2-209(a)(1) of the long-arm statute [citation] instead of section 2-209(a)(7) [citation], which is at issue here. Nevertheless, we find the factors enumerated in *Ideal Insurance Agency* to be of *some guidance* here, where the question is whether the contract is substantially connected with this state [pursuant to section 2-209(a)(7)]." (Emphasis added.) *Viktron*, 326 Ill. App. 3d at 117.

¶ 60 To the three factors identified in *Ideal Insurance Agency*, the *Viktron* court added a fourth–where the contract was negotiated. *Id.* at 117-18. The court then went on to consider these four factors in its analysis of statutory long-arm jurisdiction under section 2-209(7) of the Code. *Id.* at 118-20. Of particular note, the court *did not* apply this four-factor test when it subsequently considered whether the nonresident defendant in that case had sufficient minimum contacts with Illinois such that the exercise of personal jurisdiction comported with federal due process. *Id.* at 120-22. Instead, the court applied the broader, more general approach identified by the United States Supreme Court in *Burger King* and discussed above. *Id.*

¶ 61 Despite the fact that *Viktron* itself specifically limited the four-factor test to its statutory analysis, subsequent decisions have cited to *Viktron*–either directly or indirectly–as support for the proposition that some or all of these factors represent the applicable test for minimum contacts under a federal due process analysis. *Isringhausen*, 378 Ill. App. 3d at 1065-66 (citing to *Bolger*, and specifically noting that *Bolger* cites to *Viktron*); *Pabon*, 2012 IL App (1st) 111645, ¶ 36 (citing *Isringhausen*, and noting that *Isringhausen* cites *Bolger*, which in turn cites *Viktron*); *Bolger*, 369 Ill. App. 3d at 952 (citing *Viktron* in support of the application of the original three-factor test in the context of a federal due process analysis).

¶ 62 We do not believe that *Viktron*–which as explained above clearly limited its application of the four-factor test to its Illinois *statutory* long-arm analysis–should be cited as authority for the proposition that the same limited number of factors also represents the specific test for a *constitutional* due process analysis. In fact, we find that focusing our minimum contacts analysis to these–and only these–factors would run afoul of the United States Supreme Court's rejection of "mechanical tests" for personal jurisdiction in favor of a "highly realistic" approach. (Internal quotation marks omitted.) *Burger King Corp.*, 471 U.S. at 478-79; *id.* at 485 (rejecting "any talismanic jurisdictional formulas"). While the four factors identified in the cases cited by MGM Distribution are certainly relevant to our overall federal minimum contacts analysis under the broader inquiry described in *Burger King*, we disagree with MGM Distribution's insistence that "there can be no question that the focus of the 'minimum contacts' inquiry must be on the initiation, negotiation, formation and contemplated performance of the contract in question." Thus, our analysis will also consider the terms of the relevant contracts, the contemplated future consequences of those agreements, and the parties' actual course of dealing.

¶ 63                                3. Discussion

¶ 64 Having reviewed the record, the relevant law, the trial court's findings and the parties' arguments on appeal, we find that MGM Distribution did not in fact have sufficient

minimum contacts with Illinois to support the exercise of specific personal jurisdiction in this case. We first consider the factors of contract initiation, negotiation, formation, and contemplated performance which (as discussed above) we find to be relevant but not determinative.[4]

¶ 65   The evidence with respect to contract initiation–both with respect to the distribution agreement and the MGM-Madison LLC agreement–is somewhat complex. First, we note that MGM Distribution's obligations under the distribution agreement with Paradise apparently arose when it previously acquired Orion Pictures and terminated Mr. Stabler and other Orion Pictures employees in California. Thus, while Mr. Stabler's (and later, Paradise's) right to "put" movies to MGM Distribution was originally based upon Mr. Stabler's employment agreement with Orion Pictures (an agreement over which MGM Distribution had no control), it could be argued that MGM Distribution initiated the distribution agreement when it voluntarily and purposefully took those actions which triggered Mr. Stabler's "put" employment agreement and thus created the obligations that came to be contained in the distribution agreement. Nevertheless, all of these activities occurred in California and involved parties based in that state.

¶ 66   With respect to the MGM-Madison LLC agreement, there is evidence in the record that could arguably support a conclusion that MGM Distribution initiated that agreement after Madison LLC indicated that it wanted to pay MGM Distribution directly for the required marketing expenses for "Madison." Mr. Amari testified that he would have been perfectly happy to pay MGM Distribution directly without a direct contractual relationship, while Mr. Hester testified that such an arrangement would be a "deviation from the original distribution agreement" and therefore "had to be in writing." MGM Distribution itself created the initial draft of the agreement.

¶ 67   Still, it must be noted that it was Paradise and Madison LLC that brought "Madison" to MGM Distribution, and they did so in California. Moreover, while MGM Distribution insisted on the contractual relationship with Madison LLC, it did so only due to a specific request that came from Madison LLC–a request MGM Distribution was not required to honor pursuant to its preexisting obligations under the distribution agreement. In the end, we find that the evidence does not reveal any way in which MGM Distribution "reached out" to Madison LLC or to Illinois with respect to initiating the agreements at issue in this case.

¶ 68   Turning to contract negotiation and formation, it is undisputed that the distribution agreement was fully negotiated and executed in California, with no connection to Illinois

---

[4]We note at the outset of our discussion that we are well aware that the assertion of personal jurisdiction "is not a contest between two states, with the 'winning' state being the one with the most contacts and thus able to assert jurisdiction." *Commerce Trust Co.*, 366 Ill. App. 3d at 142. Thus, while we discuss in some detail the parties' activities in California, we are not attempting to balance MGM Distribution's connections with California against its connections with Illinois, nor are we conducting any type of *forum non conveniens* analysis. Rather, our overall discussion is guided by the requirement that our minimum contacts analysis should include a consideration of the parties' prior negotiations, their actual course of dealing, and the future consequences the parties contemplated. *Burger King Corp.*, 471 U.S. at 478-79.

-17-

whatsoever. With respect to the MGM-Madison LLC agreement, it is apparent from the record that–at a minimum–the *vast* majority of the negotiations leading up to that agreement occurred in California between representatives of MGM Distribution and Mr. Stabler and Mr. Taylor.

¶ 69   Still, there is some evidence that Mr. Amari was directly involved during the negotiation of the MGM-Madison LLC agreement and/or had to be consulted with respect to such negotiations in which he did not personally participate. Specifically, while Madison LLC employed Mr. Taylor as its attorney to handle much of those negotiations in California, and Mr. Stabler was also involved in such negotiations with MGM Distribution in California, the record also contains evidence that Mr. Amari participated in conference calls with MGM Distribution from Illinois and that MGM Distribution was aware both that final decisions had to be made by Mr. Amari and that he was located in Illinois. See *Burger King Corp.*, 471 U.S. at 480-81 (upholding personal jurisdiction due, in part, to the fact that nonresident defendant was aware that local contacts "served largely as an intermediate link" between it and the plaintiff's "decisionmaking authority" in the forum state).

¶ 70   Despite this fact, however, our "focus is on the defendant's activities within the forum State, not on those of the plaintiff." *Sackett Enterprises, Inc. v. Staren*, 211 Ill. App. 3d 997, 1004 (1991). There is *no* evidence that MGM Distribution itself reached out to Mr. Amari or Madison LLC in Illinois at any time during the negotiation of the MGM-Madison LLC agreement. Indeed, we again note that it was Paradise and Madison LLC that brought "Madison" to MGM Distribution in California for distribution pursuant to the preexisting agreement between Paradise and MGM Distribution and the Paradise-Madison LLC agreement. The distribution of "Madison" could have been accomplished via the distribution agreement and the Paradise-Madison LLC agreement alone. The *only* reason MGM Distribution has a contractual relationship with Madison LLC at all is Madison LLC's insistence on paying MGM Distribution directly for the marketing expenses that Paradise was required to pay pursuant to the distribution agreement.

¶ 71   Moreover, while Mr. Amari signed the MGM-Madison LLC agreement in Illinois, that agreement was transmitted to and from Illinois by Mr. Taylor, not by MGM Distribution. Furthermore, the MGM-Madison LLC agreement was finally executed in California when Mr. Lomis signed the agreement on behalf of MGM Distribution. See *Aasonn, LLC*, 2011 IL App (2d) 101125, ¶ 19 ("a contract is formed in the place where the last act necessary to give validity to the contract occurs"). Thus, we find that the negotiation and formation of the two agreements at issue here reflect little–if any–relevant contact with Illinois, and no contact at all resulting from MGM Distribution's own actions.

¶ 72   We now consider the terms of the relevant contracts and the future consequences contemplated by the parties. The distribution agreement itself generally required MGM Distribution to distribute up to six movies "put" to it by Paradise and to do so "consistent with the manner in which it distributes its own product of similar nature and quality." That agreement also contemplated that MGM had the right to "select and contract" with third parties to effectuate that distribution. It is evident from the record that the manner in which MGM Distribution markets and distributes movies is to engage–from California–independent third-party exhibitors, advertising agencies, and other subdistributors and licensees. Indeed,

Mr. Stabler was well aware of this fact when the distribution agreement was executed in 1999, and the very purpose of the distribution agreement was to allow Paradise to make use of MGM Distribution's "distribution system and to take advantage of the output deals they've negotiated." MGM Distribution's obligations were extended to Madison when the parties executed the MGM-Madison LLC agreement, and the record reflects that Madison LLC either knew, or should have known, how MGM Distribution went about its distribution business when it entered into that agreement. While there is some evidence that MGM Distribution was aware that the movie was to be distributed in Illinois prior to the execution of the MGM-Madison LLC agreement, there was no evidence that the agreements or the parties themselves contemplated that MGM Distribution *itself* was obligated to undertake that distribution in Illinois.

¶ 73    Thus, the terms of the relevant contracts[5] and the future consequences contemplated by the parties indicate that MGM Distribution never obligated *itself* to take any action in Illinois, nor was such in-state action by MGM Distribution contemplated by the parties. The agreements and the parties essentially contemplated that MGM Distribution would act–in California–to coordinate with Paradise, Madison LLC, and the independent third parties for the marketing and distribution of "Madison." Therefore, there is nothing about the terms of the contract or the future consequences contemplated by the parties that supports the exercise of personal jurisdiction over MGM Distribution in this state.

¶ 74    When we look at the parties' actual course of dealing, we find undisputed evidence that MGM Distribution is not registered to do business in this state, nor does it have any employees, offices, property, bank accounts, telephone listings, or agents for service of process here. MGM Distribution employees never traveled to Illinois in connection with the distribution of the movie. Whenever Mr. Amari or the other Madison LLC members and investors had a face-to-face meeting with MGM Distribution employees, those meetings occurred in California.

¶ 75    Indeed, the *vast* majority of MGM Distribution's interactions with Paradise and Madison LLC were conducted through representatives and employees in California. In his role as "middleman," Mr. Stabler worked out of his office in California. Mr. Taylor acted as Madison LLC's attorney in California, both with respect to the contract negotiation and in ensuring that Madison LLC provided MGM Distribution with all the legal documents required to distribute the film. Mr. Manpearl was Madison LLC's California marketing consultant, through which much of the distribution of "Madison" was coordinated. Mr. Carrey, one of Madison LLC's postproduction employees, worked out of offices located in California to fulfill Madison LLC's obligation to deliver the movie to MGM Distribution in its final form.

¶ 76    While Mr. Amari and most if not all of the other investors in and members of Madison LLC chose to reside in Illinois, we reiterate that our "focus is on the defendant's activities

---

[5]The MGM-Madison LLC agreement also contained a California choice-of-law provision. A "choice-of-law provision in the contract is a relevant, though not a determinant, factor in establishing jurisdiction." *Isringhausen*, 378 Ill. App. 3d at 1066.

within the forum State, not on those of the plaintiff." *Sackett Enterprises, Inc.*, 211 Ill. App. 3d at 1004; see also *Burger King Corp.*, 471 U.S. at 479 (a plaintiff's contract with nonresident defendant alone cannot automatically establish sufficient minimum contacts with the plaintiff's home forum).

¶ 77 Still, both the distribution agreement and the MGM-Madison LLC agreements required MGM Distribution to arrange for an initial theatrical release of "Madison" pursuant to a mutually agreed-upon marketing plan. While there was some dispute about the exact nature of MGM Distribution's right to approve or disapprove of Madison LLC's proposed marketing plan–as well as the extent to which MGM Distribution may have exercised that right to control the scope of the initial distribution of "Madison"–there is certainly evidence supporting the trial court's conclusion that the final marketing plan intended "Madison" to be a "limited release movie," with a broader release contingent upon initial commercial success. Moreover, the process by which that decision came to be made was–as described by MGM Distribution's own consultant, Mr. Hester–"collaborative" at a minimum and comprised of some "back and forth" between MGM Distribution and Madison LLC.

¶ 78 Furthermore, whether before or after the MGM-Madison LLC agreement was actually executed, MGM Distribution and Madison LLC did ultimately agree that "Madison" would be marketed and distributed in Illinois. Indeed, there is testimony and documentary evidence to support the trial court's finding that Illinois was actually disproportionally targeted as part of the initial limited release. "Madison" was initially released in 15 states. However, 25% of the initial marketing expenses (approximately $500,000) were incurred in Illinois on such things as advertisements in local newspapers and commercials on local radio and television stations. That represented a higher percentage of marketing expenditures than in any other state. Furthermore, while the movie was released in 15 states, more than 10% of the screens upon which "Madison" was initially exhibited were located in Illinois. Additionally, MGM Distribution's answers to plaintiffs' requests to admit indicated that it did in fact license rights to third parties for distribution of movies via DVD in Illinois, and that DVDs of "Madison" were actually distributed in this state.

¶ 79 However, there is *no* evidence that it was MGM Distribution that sought to have Illinois specifically targeted as part of the initial theatrical release of "Madison." The evidence shows that it was Madison LLC, Mr. Amari, and the other investors that were particularly insistent on a significant theatrical release in this state, and MGM Distribution merely acquiesced to that part of the marketing plan. Moreover, MGM Distribution's obligations with respect to the "downstream" distribution of the movie in other media such as DVDs and television were at least national in scope. There is no evidence that the "downstream" distribution of the movie, a significant component of the parties' agreements, specifically targeted Illinois in any way.

¶ 80 It is also clear that MGM Distribution *itself* did not conduct *any* marketing or distribution activities in Illinois. The record reflects that all of the in-state distribution activities with respect to "Madison" were conducted by independent third parties. These third parties were responsible for exhibiting the movie in Illinois theaters, placing advertising for the movie in local media outlets, and distributing DVDs of the movie in this state. There is no evidence that MGM Distribution reached out to Illinois to engage any of these third parties. With

respect to the third parties that actually exhibited "Madison" in Illinois theaters, it is undisputed that MGM Distribution negotiated its agreements with those exhibitors from its offices in California.

¶ 81     We do acknowledge that there is at least *some* support for the notion that the in-state acts of independent contractors can be imputed to a nonresident defendant for purposes of exercising personal jurisdiction. *Richard Knorr International, Ltd. v. Geostar, Inc.*, No. 08 C 5414, 2010 WL 1325641, at *10-12 (N.D. Ill. Mar. 30, 2010); *Clearing Corp. v. Financial & Energy Exchange Ltd.*, No. 09 C 5383, 2010 WL 624864, at *5 n.4 (N.D. Ill. Feb. 18, 2010). As the court stated in *Richard Knorr International*: "[B]y dispatching independent contractors to do its bidding in a forum state, a corporation can acquire sufficient contacts for the forum's exercise of personal jurisdiction to comport with due process." *Richard Knorr International*, 2010 WL 624864 at *10.

¶ 82     Additionally, in light of the fact that MGM Distribution purposefully utilized such third parties fo fulfill its contractual marketing and distribution obligations to plaintiffs in Illinois, it could be argued that charging these contacts to MGM Distribution would not result in jurisdiction being based upon contacts that were " 'random' " or " 'fortuitous.' " *Burger King Corp.*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Nor could the actions performed in Illinois by those independent contractors, pursuant to MGM Distribution's direction, be fairly described as the "*unilateral* activity of another party or a third person" such that personal jurisdiction would be improper. (Emphasis added.) *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).

¶ 83     Nevertheless, the clear weight of authority only supports imputing the in-state acts of an *agent* to a nonresident defendant. *Allerion, Inc. v. Nueva Icacos, S.A. de C.V.*, 283 Ill. App. 3d 40, 48 (1996) ("The due process clause permits personal jurisdiction to be exercised over a defendant based upon acts of its agent."); *Henderson*, 359 Ill. App. 3d at 614 (same); *Damian Services Corp. v. PLC Services, Inc.*, 763 F. Supp. 369, 372 (N.D. Ill. 1991) (same).[6] Applying the same rule to the in-state actions of independent contractors has never seen such universal support. *Olympia Capital Associates, L.P. v. Jackson*, 247 S.W.3d 399, 413 (Tex. Ct. App. 2008) ("an agent's contacts with the forum are attributable to the principal, but the contacts of an independent contractor are not"); *S&D Trading Academy, LLC v. AAFIS, Inc.*, 494 F. Supp. 2d 558, 565 (S.D. Tex. 2007) (same); *Wyatt v. Walt Disney World, Co.*, 565 S.E.2d 705, 710 (N.C. Ct. App. 2002) ("Actions of an independent contractor are not attributable to the party hiring it, and thus do not, without more, establish jurisdiction."); *Smith v. Piper Aircraft Corp.*, 425 F.2d 823, 826 (5th Cir. 1970) (same). Moreover, while the actions of these third parties in Illinois may not have been " 'random' " or " 'fortuitous,' " we find that they can be fairly described as " 'attenuated.' " *Burger King Corp.*, 471 U.S. at 480 (quoting *Keeton*, 465 U.S. at 774).

¶ 84     Thus, while there is *some* authority to support imputing the activities of such third parties

---

[6]Indeed, while our discussion is focused on the requirements of federal due process, we note that the Illinois long-arm statute itself authorizes personal jurisdiction only for certain acts made "in person or through an *agent*." (Emphasis added.) 735 ILCS 5/2-209(a) (West 2010).

to MGM Distribution, we decline to do so here. In part, this is due to the fact that courts have typically done so only where there is evidence of an agency relationship. See, *e.g.*, *Allerion*, 283 Ill. App. 3d at 48; *Henderson*, 359 Ill. App. 3d at 614. There is no such evidence in this case. See *Doe v. Brouillette*, 389 Ill. App. 3d 595, 608 (2009) (noting that it is generally "plaintiff's burden to prove the existence of an agency relationship"). Moreover, we also find that to do so in this case would be inappropriate due to the terms of the parties' agreements, the anticipated future consequences of those agreements, and the parties' actual course of dealing. As explained above, it was always contemplated by the parties that MGM Distribution would act in California to coordinate the distribution of "Madison" via third-party contractors. Indeed, it was MGM Distribution's "output deals" with those third parties that made the distribution agreement so attractive to Paradise and Madison LLC in the first place.

¶ 85    In light of the above discussion, we find inapplicable a number of possible rationales upon which minimum contacts with Illinois might be based. For example, courts have recognized minimum contacts with a forum state where a nonresident defendant has "purposefully directed its activities at the forum state" (*Henderson*, 359 Ill. App. 3d at 614), "accepted the privilege of conducting business within the forum state *** [by] engag[ing] in significant activities within the forum state" (*Commerce Trust Co.*, 366 Ill. App. 3d at 144), entered into a contract requiring it to perform a "substantial portion of the contract within this state" (*Viktron*, 326 Ill. App. 3d at 121), or "purposefully derived benefits from its activities in the forum state" (*Henderson*, 359 Ill. App. 3d at 614). It is also well recognized that "[a] defendant's lack of physical presence in a forum does not defeat jurisdiction there." *Aasonn, LLC*, 2011 IL App (2d) 101125, ¶ 23; *Soria v. Chrysler Canada, Inc.*, 2011 IL App (2d) 101236, ¶ 29; see also *Burger King Corp.*, 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").

¶ 86    However, common to all these rationales is the foundational requirement that a nonresident defendant either "purposefully direct" its activities toward the forum state or actually engage in activities there. Once it is understood that MGM Distribution itself never specifically targeted Illinois for marketing or distribution, nor did MGM Distribution itself undertake any marketing or distribution activities in Illinois, these potential sources of support for a finding of minimum contacts become inapposite.

¶ 87    Finally, we address Madison LLC's contention that minimum contacts with Illinois have been established in this case because "MGM Distribution made a deliberate decision to enter into an ongoing business relationship with an entity it knew was based in Illinois." Courts have recognized that personal jurisdiction can indeed be based upon such an ongoing contractual relationship. *Burger King Corp.*, 471 U.S. at 476 (jurisdiction "presumptively" appropriate where defendant "has created 'continuing obligations' between himself and residents of the forum" (quoting *Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n*, 339 U.S. 643, 648 (1950))); *Commerce Trust Co.*, 366 Ill. App. 3d at 144 ("A defendant has accepted the privilege of conducting business within the forum state and can reasonably be required to litigate there if he *** created continuing obligations with a citizen

-22-

of that state."). However, we do not find this general rule *requires* a finding of minimum contacts in this case. See *Capital Associates Development Corp. v. James E. Roberts-Ohbayashi Corp.*,138 Ill. App. 3d 1031, 1037 (1985) ("the fact that a defendant voluntarily enters into a business transaction with an entity he knows to be an Illinois resident is also an important *consideration*" (emphasis added)). Nor do we find that it would be appropriate to apply this rationale here.

¶ 88    In this case, Paradise (a Delaware corporation with its principal place of business in California) and Madison LLC (a limited liability company organized in California) came to MGM Distribution in California to propose the distribution of "Madison." MGM Distribution did not reach out to Madison LLC in Illinois to create a business relationship, and the MGM-Madison LLC agreement itself resulted from Madison's request to pay MGM Distribution directly for the marketing funds required under the distribution agreement. Moreover, the evidence of MGM Distribution's knowledge that Madison LLC "was based in Illinois" at the time it entered into the MGM-Madison LLC agreement was conflicting. For its part, MGM Distribution maintains that it only knew that Mr. Amari himself maintained an office there.

¶ 89    Nor are we convinced that Madison LLC has established that it is in fact a resident or citizen of Illinois. We note that in discussing the possibility of statutory long-arm personal jurisdiction under section 2-209(a)(1) of the Code, the trial court stated: "[I]f I were required to make a decision–and I'm not–well, if I were required to make a decision, I would conclude that the nerve center of [Madison LLC] was in fact in Illinois." We are not so sure.

¶ 90    First, it is not at all clear that a "nerve center" test is the appropriate method for determining the residency or citizenship of a limited liability company. The parties themselves have not provided this court with any authority specifically identifying the proper method for resolving this question for purposes of personal jurisdiction. Rather, they seem to assume that a limited liability company is a resident or citizen wherever it has its primary place of business.

¶ 91    Second, even if we assumed that this was the appropriate test, we would have some reservations about concluding that Madison LLC did in fact have its principal place of business in Illinois. The record reflects that Madison LLC was organized in California to provide a specific investment vehicle for the production and distribution of "Madison." The company originally indicated that its principal offices were in California, and Mr. Bindley served as its president and agent for service of process there. The movie itself was primarily filmed in Indiana, and a significant amount of the pre- and postproduction of the movie was completed in various offices Madison LLC rented in California. As discussed above, most of the movie's distribution was also arranged in California by its employees and other representatives.

¶ 92    While Mr. Amari and most if not all of the other investors in and members of Madison LLC chose to reside in Illinois, we again note that MGM Distribution's contractual obligations were to Madison LLC, not Mr. Amari or the other members. A California limited liability company is a legal entity separate and distinct from its members. *Abrahim & Sons Enterprises v. Equilon Enterprises, LLC*, 292 F.3d 958, 962 (9th Cir. 2002); *PacLink*

*Communications International, Inc. v. Superior Court*, 109 Cal. Rptr. 2d 436, 439 (Cal. Ct. App. 2001). Moreover, while the evidence does establish that Mr. Amari had an office here in which he engaged in business activities on behalf of Madison LLC, the evidence also established Madison LLC did not have a lease for that space and it was not actually registered to do business in this state.

¶ 93    Even if we assumed or concluded that Madison LLC was in fact a resident or citizen of Illinois, we note that MGM Distribution's primary obligations with respect to the distribution of "Madison" arose out of the distribution agreement. That agreement predates the MGM-Madison agreement by five years and is between two Delaware companies operating out of California. The MGM-Madison LLC agreement arose out of Madison LLC's request for a "deviation from the original distribution agreement," and is in some sense tangential to MGM Distribution's obligations under the original agreement. Finally, we note that MGM Distribution is primarily alleged to have breached the terms of the distribution agreement, not the terms of the MGM-Madison LLC agreement.

¶ 94    For these reasons, we simply do not think that it would be appropriate to base personal jurisdiction over MGM Distribution upon the fact that it entered into a business relationship with Madison LLC via the MGM-Madison LLC agreement. In reaching this conclusion, we are guided by the United States Supreme Court's rejection of "any talismanic jurisdictional formulas." *Burger King Corp.*, 471 U.S. at 485. As discussed above, our approach must be highly realistic. *Id.* at 479. The facts of each case must be considered to determine whether the exercise of personal jurisdiction comports with the requirements of federal due process. *Id.* at 485-86. "This approach does, of course, preclude clear-cut jurisdictional rules. But any inquiry into fair play and substantial justice necessarily requires determinations in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable." (Internal quotation marks omitted.) *Id.* at 486 n.29 (quoting *Kulko v. Superior Court*, 436 U.S. 84, 92 (1978)).

¶ 95    Moreover, we reiterate that "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' [Citation.] 'Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.' [Citation.]" (Emphasis in original.) *Asahi*, 480 U.S. at 109. As such, personal jurisdiction should be exercised only where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. [Citations.] The Due Process Clause, by ensuring the 'orderly administration of the laws,' [citation], gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

¶ 96    Ultimately, we disagree with the trial court's conclusion that "MGM Distribution clearly availed itself of the benefits and protections of the laws of the State of Illinois. By marketing and distributing the film heavily in Illinois, MGM should have reasonably anticipated being haled into court on this date." We first find this conclusion to be against the manifest weight of the evidence, because the record reflects that MGM Distribution *itself* neither specifically

targeted Illinois for distribution nor actually engaged in any distribution activities in this state. Moreover, we also find that it represents an improper application of the relevant law to the facts of this case.

¶ 97    We find that it would be improper to allow plaintiffs to knowingly contract with MGM Distribution to distribute "Madison" in a manner "consistent with the manner in which it distributes its own product of similar nature and quality"–which as discussed above involved arranging *in California* for nationwide distribution of movies via third parties–and then attempt to hale it into court in Illinois. Doing so would not allow MGM Distribution to "structure [its] primary conduct with some minimum assurance as to where that conduct will and will not render [it] liable to suit." *Id.* It would also "offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

¶ 98    Finally, because we find that MGM Distribution did not have sufficient contacts with Illinois such that the exercise of personal jurisdiction would comport with the requirement of due process, we obviously need not go on to consider whether the plaintiffs' claims arose out of or were related to such contacts, or if it is reasonable to require MGM Distribution to litigate here.

¶ 99                                    III. CONCLUSION

¶ 100    For the foregoing reasons, we reverse the circuit court's denial of MGM Distribution's motion to dismiss for lack of personal jurisdiction and remand this case for further proceedings.

¶ 101    Reversed and remanded.