2020 IL App (2d) 191115-U
No. 2-19-1115
Order filed September 28, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| CORAL CHEMICAL COMPANY, | ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CH-1667 |
| CALVARY INDUSTRIES, INC., and RAJESH PATEL, | ) ) ) | |
| Defendants | ) ) | Honorable Daniel L. Jasica, |
| (Calvary Industries, Inc., Defendant-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Birkett and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Plaintiff established that nonresident defendant had sufficient minimum contacts with Illinois such that the exercise of jurisdiction over defendant did not offend traditional notions of fair play and substantial justice. Thus, we affirmed the trial court's denial of defendant's motion to dismiss for lack of personal jurisdiction the verified third amended complaint.

¶ 2    Defendant, Calvary Industries, Inc. (Calvary), appeals from the trial court's order denying its motion to dismiss for lack of personal jurisdiction the verified third amended complaint of plaintiff, Coral Chemical Company (Coral). Calvary is an Ohio corporation. The central issue in

this appeal is whether the exercise of specific jurisdiction over Calvary comports with due process. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Coral and Calvary are competitors in the business of manufacturing industrial chemical products. Their dispute arose in 2015 when Coral's former employee, Rajesh Patel, began working for Calvary as a consultant. Patel is a chemist and worked in the area of wastewater treatment services.

¶ 5     Patel was the sole defendant in Coral's initial verified complaint for breach of contract and violation of the Illinois Trade Secrets Act (Trade Secrets Act) (765 ILCS 1065/1 *et seq.* (West 2014)), filed on October 1, 2015. Coral alleged that Patel violated the restrictive covenants and confidentiality agreements in his employment agreements and misappropriated Coral's proprietary trade secrets and confidential information. On November 12, 2015, Coral filed a verified amended complaint to add Calvary as a respondent in discovery and issued discovery requests to Calvary. Calvary moved to quash the summons and discovery requests and for dismissal from the action pursuant to section 2-301 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-301 (West 2014)) on grounds that it was not subject to personal jurisdiction in Illinois.

¶ 6     Following briefing and argument on the motion, on September 12, 2016, the trial court granted Calvary's motion to quash the summons and discovery requests and dismissed Calvary as a respondent in discovery from the suit. In its written order, the trial court held that Calvary is an Ohio corporation and not considered to be "at home" in Illinois to support a finding of general jurisdiction and that the lawsuit does not arise out of Calvary's contacts with Illinois to support a finding of specific jurisdiction. The trial court further found that Calvary's "four sales representatives and one support personnel in Illinois" and "three customers in Illinois" were

insufficient to establish jurisdiction. Moreover, the trial court found, the "underlying lawsuit arises out of a contract between Coral [] and [] Patel and a contract between those parties standing alone is not sufficient to establish general or specific jurisdiction by an Illinois court over Calvary []."

¶ 7     Coral proceeded to issue a local subpoena in Ohio to obtain discovery from Calvary. Without waiving its objection to personal jurisdiction in Illinois, Calvary presented its corporate representative, John O'Connor, for deposition. The record demonstrates that O'Connor is a former Coral employee and worked with Patel at Coral for several years. Coral also deposed Patel and conducted a forensic review of his computer.

¶ 8     Following discovery, on December 14, 2017, Coral filed a verified second amended complaint, adding Calvary as a defendant this time. Coral reiterated its claims for breach of contract and violation of the Trade Secrets Act against Patel and alleged claims for violation of the Trade Secrets Act and tortious interference with contractual relations against Calvary. Calvary moved to dismiss the verified second amended complaint pursuant to section 2-301 for lack of personal jurisdiction. Following briefing, on May 31, 2018, the trial court heard argument on the motion to dismiss. While the verified second amended complaint included allegations regarding Calvary's purported contacts with Illinois, counsel for Coral also argued that the deposition testimony of O'Connor and Patel demonstrated a basis for jurisdiction over Calvary. Namely, according to counsel, O'Connor's deposition testimony established that Calvary's business operations were "run out of Antioch," and Patel's deposition testimony revealed that O'Connor recruited Patel during a meeting at a restaurant in Buffalo Grove in 2015.

¶ 9     At the conclusion of the May 31, 2018, argument, the trial court granted Calvary's motion and dismissed the second amended complaint *albeit* without prejudice. The trial court reasoned: "It seems to me that the argument here would amount to saying that anytime a corporation does a

nationwide recruitment and interview[s] someone in that particular state, they would therefore be subject to suit just because an interview occurred there. I don't see any authority to that effect, and I don't think that's what the law provides. There would need to—at a minimum be specific allegations of fact with respect to what took place at the meeting to give rise to a tortious act in Illinois." Nevertheless, the trial court granted Coral leave to amend its complaint in light of the assertion that Calvary maintained a business office in Illinois and further stated: "I'm not sure that you're going to be able to allege specific facts with respect to the meeting. You certainly can try."

¶ 10    Meanwhile, the parties also litigated in Ohio. On February 12, 2016, Calvary filed a declaratory judgment action in Ohio seeking declaratory relief as to its rights and liabilities with respect to the ability to hire Coral employees generally and with respect to Coral's employment agreements with Patel. Coral moved to dismiss or stay the proceeding on grounds that the issues raised were pending in Illinois. The Ohio trial court granted the motion and dismissed the action on *forum non conveniens* grounds. It did so, however, on October 19, 2016—after Calvary had been dismissed as a respondent in discovery here but before it was named as a defendant in the verified second amended complaint.

¶ 11    The Ohio Appellate Court reversed the trial court's dismissal order and remanded to the trial court with instructions to address not only the appropriateness of the dismissal but also the propriety of the request for declaratory relief in the first instance. *Calvary Industries, Inc. v. Coral Chemical Co.*, No. CA2016-12-233, 2017-Ohio-7279 (Ohio Ct. App. Aug. 21, 2017). On remand, the Ohio trial court again dismissed the action. The trial court held that the action failed to raise a justiciable issue, as Calvary merely sought an advisory opinion on whether it may hire former Coral employees. Moreover, the trial court held that principles of *forum non conveniens* warranted dismissal. The trial court pointed out that Calvary "is asking the Court to determine whether an

Illinois citizen, who is not a party to this matter, conveyed proprietary information belonging to an Illinois company, [Coral], to [Calvary]." Thus, the trial court reasoned, "it may be necessary to call witnesses who reside in Illinois and have no ties to Ohio." In addition, "the only contract, which has been specifically contemplated in this matter, is not even before this Court, but is instead being litigated in Illinois, where both parties to the contract reside." On April 8, 2019, the Ohio Appellate Court affirmed the trial court's June 25, 2018, dismissal order. *Calvary Industries, Inc. v. Coral Chemical Co.*, No. CA2018-07-134, 2019-Ohio-1288 (Ohio Ct. App. Apr. 8, 2019).

¶ 12    Back in Illinois, on June 28, 2018, Coral filed its verified third amended complaint against Patel and Calvary. Coral reiterated its claims for breach of contract and violation of the Trade Secrets Act against Patel and claims for violation of the Trade Secrets Act and tortious interference with contractual relations against Calvary. Coral added an allegation relevant to the exercise of general jurisdiction: "Calvary maintains a physical presence in Illinois through management of its national sales force using offices located in Illinois through employees who are Illinois residents."

¶ 13    The balance of additional allegations pertained to the exercise of specific jurisdiction over Calvary. Coral alleged that "[a]t all times relevant to this Complaint, Calvary regularly transacted business through its general manager [O'Connor] through an office located in Lake County, Illinois " and that "the contracts at issue were negotiated in Lake County, Illinois." Namely, Coral alleged: (1) "[o]n June 5, 2015, Patel met with O'Connor in Buffalo Grove, Illinois for the purpose of negotiating an employment agreement with Calvary"; (2) "[i]n the course of this meeting and with O'Connor's knowledge, Patel attempted to gain access to Coral's computer network for the purpose of sharing contents of information stored therein with O'Connor"; (3) "[o]n June 6, 2015, Patel met with O'Connor again, and did so for the purpose of sharing Coral documents with O'Connor"; (4) "O'Connor forwarded the documents he obtained from Patel to other Calvary

employees on June 8, 2015"; (5) "[i]n the course of Patel's meetings with O'Connor, Patel provided O'Connor with copies of [his employment agreements with Coral], thereby placing Calvary on notice of Patel's ongoing obligations to Coral"; and (6) "[b]etween June 6, 2015[,] and August 3, 2015, O'Connor and Patel continued to negotiate the terms of a potential agreement between Patel and Calvary, with these negotiations taking place in Illinois."

¶ 14    In addition, Coral alleged that the "scheme between Patel and Calvary identified herein is a tortious action that was devised in Lake County, Illinois" and that "the transfer of Coral's trade secrets and confidential information to Calvary took place in Lake County, Illinois." Coral elaborated: (1) "[i]n the course of Patel's negotiations with O'Connor on behalf of Calvary, Patel and O'Connor formulated a plan whereby Patel would violate the terms of his agreements with Coral for the purpose of advancing Calvary's business interests, including but not limited to development of waste water treatment business for Calvary utilizing Coral's product formulas, processes and methods"; (2) "[f]urthermore, Calvary and Patel developed a scheme by which in exchange for monthly payments to Patel, Patel would provide Calvary with information regarding Coral accounts and the amount of revenue Coral received from these accounts"; (3) "[t]he scheme devised by Calvary and Patel also included a provision whereby Calvary would pay Patel for sales of Calvary products based on formulas developed by Patel while he was employed by Coral, with payments to Patel continuing beyond the term of any employment or contractor relationship between Calvary and Patel"; (4) "Patel retained information from Coral detailing Coral's testing procedures, processes, customer lists and formulas, and furnished this information to Calvary in furtherance of Calvary's business interests"; (5) "[a]fter devising their scheme, Patel and Calvary entered into an employment agreement effective August 3, 2015"; (6) "[d]uring his employment with Calvary, Patel continued to work primarily from his home in Illinois, and continued to report

to O'Connor, who worked primarily from his Lake County, Illinois location in the course of managing Calvary's sales nationwide"; and (7) "[w]hile employed by Calvary, Patel continued to utilize Coral's confidential and trade secret information for Calvary's benefit."

¶ 15   Calvary filed a motion to dismiss the verified third amended complaint pursuant to section 2-301 for lack of personal jurisdiction. The motion was supported by, *inter alia*, the deposition testimony of O'Connor and the affidavit of Chris Berger, Calvary's vice president and director of product development.

¶ 16   We review the supporting documentary evidence in the context of Calvary's arguments. Calvary first challenged the exercise of general jurisdiction. In support, Berger attested that Calvary maintains no physical presence in Illinois and derives approximately 2% of its annual gross revenue from sales to Illinois-based customers.

¶ 17   Calvary also argued that its consulting agreement with Patel did not support the exercise of specific jurisdiction. The consulting agreement contained an Ohio choice-of-law provision and specified that Patel's territory was the North Central Americas. And Calvary's president, Austin Morelock, signed the agreement in Ohio the day after Patel signed the agreement.

¶ 18   In addressing the alleged interactions between O'Connor and Patel, Calvary cited O'Connor's deposition testimony that he and Patel were friends and had been co-workers for 20 years as well as Berger's attestation that O'Connor and Patel "worked with one another at Coral for over [20] years, and upon information and belief, were friendly with one another." Berger also attested that "O'Connor was not empowered to make Patel any offer of employment, nor to negotiate the terms of Patel's employment or otherwise at Calvary." According to Berger's affidavit, O'Connor was "not the General Manager of Calvary, but the General Manager of Metal Finishing." O'Connor requested the title of general manager but "had no managerial duties at

Calvary" and "[n]o Calvary employee reported to O'Connor ****." Rather, O'Connor was a "technical expert available to provide advice to Calvary salespeople to assist them in selling and servicing Calvary's metal finishing products." In addition, Berger attested that "O'Connor did not spend more than one weekday per week at his home in Lake County, Illinois, as he traveled approximately 80% of the time on business."

¶ 19    Calvary further argued that the alleged causes of action for violation of the Trade Secrets Act and tortious interference with contractual relations did not support the exercise of specific jurisdiction. Calvary cited O'Connor's deposition testimony that "we instructed [Patel] to follow his legal obligations" and "wanted to make sure that all proper and legal contracts in place would not be violated." O'Connor added that "[w]e were not hiring [Patel] for proprietary information." In response to the question of whether "anyone from Calvary ever aske[d] Patel to disclose testing procedures used at Coral so they could use them at Calvary," O'Connor responded, "no." In response to the question of whether "Calvary ever receive[d], to your knowledge, any information that was proprietary or confidential or [a] trade secret to Coral," O'Connor responded, "[n]ot that I'm aware of."

¶ 20    Regarding the allegation that on June 8, 2015, O'Connor forwarded the documents from Patel to Calvary employees, Berger attested: "Calvary sought Patel's employment related documentation to ensure it complied strictly with any and all post-employment restrictions"; "[o]n June 8, 2015[,] O'Connor sent Patel's employment related agreements to Calvary staff to ensure that John Morelock [Calvary's chief executive officer] had the requisite information necessary to make a hiring decision relating to Patel"; "O'Connor's June 8, 2015[,] email relating to Patel's employment related agreements is the only e-mail O'Connor sent on June 8, 2015[,] to Calvary staff members regarding Patel"; and "O'Connor never sent or otherwise revealed any trade secret

or confidential [Coral] documents on June 8, 2015[,] to any Calvary staff, or at any other time before or after June 8, 2015."

¶ 21    Regarding the allegation of a scheme between Patel and Calvary, Berger attested that "Calvary never offered to make any payments to Patel conditioned [on] providing Calvary with information regarding Coral accounts, and the amount of revenue Coral received from these unspecified accounts" and that "Calvary never offered to make any payments to Patel conditioned on the usage of 'formulas' developed by Patel while employed by Coral." As for the alleged transfer of Coral's trade secrets and confidential information, Berger attested that "[m]aterials, methods, testing procedures and processes for wastewater treatment are widely known and well documented in trade literature and textbooks" and cited three textbooks in Calvary's research library that detail practices for wastewater treatment. Berger further attested that "Calvary was never provided with any of Coral's testing procedures, processes, customer lists, or formulas by Patel or any other source," and that "Calvary never received, requested[,] or otherwise came into contact with any trade secrets or confidential information belonging to Coral, whether in Lake County, Illinois or any other location worldwide."

¶ 22    The trial court, over Calvary's objection, authorized Coral to conduct discovery on the issues raised in Berger's affidavit before responding to the motion to dismiss. Following discovery, including the deposition of Berger as Calvary's corporate representative, Coral filed a response to the motion to dismiss with 23 accompanying exhibits. The exhibits were internal Calvary e-mail correspondence, documents recovered from Patel's computer, and the deposition testimony of Berger, Connolly, and Patel. Again, we review the supporting documentary evidence in the context of Coral's arguments.

¶ 23    Coral argued that Calvary purposefully availed itself of the privilege of conducting business in Illinois through its initiation of a contractual relationship with Patel. Indeed, Patel testified at his deposition: "I didn't reach out to Calvary[;] Calvary called me." Patel elaborated: "O'Connor called me that he's interested to hire me." On June 6, 2015, O'Connor e-mailed John Morelock, attaching Patel's employment agreements with Coral and stating that he met with Patel "yesterday, Friday, June 5th" during which Patel informed him about the status of his employment negotiations with Coral. O'Connor also stated in the June 6, 2015, e-mail that during the meeting, he "informed [Patel] that I was not interested in talking about Coral accounts or products, but we explored possible employment opportunities at Calvary." O'Connor further stated that "during our meeting, [Patel] noticed that his Coral email was shut down." On June 8, 2015, O'Connor e-mailed John Morelock with a copy to Austin Morelock, stating that he "met up with [Patel] again on Saturday to retrieve all signed documents he has ever done with Coral" and requesting that they "look them over and we can develop a plan to proceed or inform [Patel] that it is not possible."

¶ 24    The following month, on July 20, 2015, O'Connor e-mailed John Morelock, Austin Morelock, and Chris Berger, stating: "I have [Patel] coming to Calvary tomorrow morning through lunch. Our objective is to see if [Patel] can help our WWT [wastewater treatment] product line and also help us generate growth for it. Let me know what your schedules are so we can evaluate how we could utilize his knowledge." Austin Morelock responded and questioned whether "Pete Neff [Calvary's product manager]" should be involved. Berger replied: "I think it's important for him to be present if at all possible. I think we have good products, just lack opportunities. We don't want to pay for anything we already have. I think the value [Patel] offers is the account locations and dollar amounts, as well as the know-how. We are limited to two guys with excellent know-how, but no industry connections in wastewater."

¶ 25    When questioned at his deposition as to "[w]hat account locations are you referring to that [Patel] offers," Berger testified: "So in general, there are lots of customers out there that do lots of different things. Because people have different professional and life experiences leading up to a certain point, they have different contacts in the industry, and so that would be that, you know, who are his industry contacts." Berger further stated, "I'm not addressing any account locations specifically." In response to the question of the "dollar amounts" to which he was referring, Berger testified: "So dollar amounts of, hey, I know a customer who does—who does this process and I could guess it's probably worth about X amount of dollars a year. That's something that we should go after, again, utilizing contacts and people he knows in the industry. He may know people that we don't." Berger testified that Patel did not tell him about any accounts.

¶ 26    Berger also testified that John Morelock and Austin Morelock were the only individuals at Calvary with authority to negotiate employment contracts or make employment offers. Yet Berger acknowledged that he did not discuss with them whether they negotiated the terms of Patel's employment contract. The internal Calvary e-mail correspondence reflected that on July 27, 2015, O'Connor e-mailed John Morelock with a copy to Austin Morelock, attaching a draft letter from O'Connor to Patel that set forth the terms of a consulting agreement. O'Connor stated: "This covers what I have agreed with [Patel]. I know this needs more lawyer language for signatures, but I would like to get it to [Patel] so that all are on the same page. We can then send documents for signing over the next few days. I would like to have him down with me for a few days next week at [client names]. Then the following week he would be in Cincinnati with Chris and Pete to work on products and how he will handle testing for us at his house."

¶ 27    Later that day, on July 27, 2015, O'Connor e-mailed Patel an offer letter stating, "[t]his should outline what we agreed to." About a half-hour later, Kimberly Fraley (Calvary's quality

and compliance manager) e-mailed the proposed consulting agreement to O'Connor with a copy to John Morelock and Austin Morelock and requested that O'Connor "review and forward to [Patel] if this meets our needs," [as] "I've incorporated your terms into our standard agreement." A few hours later, O'Connor forwarded the proposed consulting agreement to Patel with a copy to Austin Morelock. O'Connor stated: "Here is the agreement. Don't be concerned, this is the standard wording for all of our Agents which is what you are classified as. If you have no questions, and everything looks okay, go ahead and sign and either fax or mail the document back to Kim's attention. Kim will then have a signed copy for your records when you go to Cincinnati or she can mail it back for your records."

¶ 28    Coral also argued in its response to the motion to dismiss the verified third amended complaint that its alleged injuries arose from Calvary's forum-related activities. In particular, Coral disputed Berger's attestation that "Calvary was never provided with any of Coral's testing procedures, processes, customer lists, or formulas by Patel or any other source." Coral submitted two PowerPoint presentations regarding wastewater treatment that were recovered from Patel's computer. The documents varied in their branding, *i.e.*, one included information labeled "Coral's Waste Treatment Products," "Coral's Mission for New Customers," and "Coral Commitment"; the other included information labeled "Calvary's Waste Treatment Products," "Calvary's Mission for New Customers," and "Calvary Commitment."

¶ 29    In addition, Coral submitted a document that outlines procedures for wastewater "jar testing" as well as metadata showing that the original author was a Coral employee but that Patel had modified the document on August 26, 2015, and created a new version of the document on September 2, 2015. On September 2, 2015, Patel e-mailed several Calvary employees, including Berger, stating "[t]he attached are Jar Test Procedure and Trouble Shooting of Filter press;

Diaphragm pump and process." Coral also attached as an exhibit to its response a document entitled "Declaration of Peter W. Dority." Dority is Coral's vice president of sales and marketing. Dority explained the proprietary nature of information in the jar testing procedures and PowerPoint presentations and the distinctions in the original and modified versions of the documents.

¶ 30    Calvary filed a reply in support of its motion to dismiss and attached as an exhibit a second affidavit from Berger. Berger attested that the PowerPoint presentations were not shared with him or his staff. He specified that he never "saw, received, or viewed" the PowerPoint presentation with Calvary branding and "to [his] knowledge, this document was not distributed to any Calvary staff." Berger also attested that all of the jar-testing procedures are "in the public domain, and none [] are proprietary, trade secret[,] or confidential." Berger included citation to Google search results for jar testing procedures. He further attested that while the jar testing procedures attached as an exhibit to Coral's response to the motion to dismiss "lists the names of certain Coral solutions[,] [] the mere name of a chemical solution is of no value." Rather, "[i]t is the actual ingredients comprising the solution, that is, how to reproduce the solution, that is valuable." According to Berger, that information was not contained in the exhibit, and "Calvary at all times made it clear to [Patel] that no such information was to be shared with anyone at Calvary under any circumstances."

¶ 31    On November 13, 2019, the trial court heard argument on Calvary's motion to dismiss the verified third amended complaint. At the outset, the trial court inquired, "one of my questions to both of you is do I have to have an evidentiary hearing in order to rule on this *** ?" The transcript reflects that Calvary's counsel did not acknowledge the question, never requested an evidentiary hearing, and agreed that "disputes in terms of which set of facts is correct" must be resolved in the plaintiff's favor in deciding the motion to dismiss.

¶ 32    On November 21, 2019, the trial court entered a written order, denying Calvary's motion to dismiss the verified third amended complaint. The trial court stated that its decision was based upon the exercise of specific personal jurisdiction over Calvary, as Coral did not advance any arguments in support of the exercise of general personal jurisdiction.

¶ 33    The trial court found, based upon the record, and resolving any conflicts in the testimony, affidavits, and exhibits in favor of Coral, Coral had established sufficient minimum contacts based on the recruitment of Patel and negotiation of Patel's consulting agreement with Calvary through O'Connor in Illinois. The trial court noted that, while Calvary claimed that Patel initiated contact with O'Connor, Patel testified that O'Connor contacted him to discuss potential employment with Calvary. The trial court also noted that, while Berger's affidavit sought to minimize O'Connor's role in the recruitment and hiring of Patel, the documentary evidence established that O'Connor was Calvary's primary contact with Patel during the hiring process, including face-to-face follow-up meetings in Illinois during which Patel provided O'Connor his employment agreements with Coral. O'Connor drafted and e-mailed a letter to Patel setting forth the terms of a consulting agreement with Calvary and subsequently e-mailed the consulting agreement to Patel for Patel to sign in Illinois. Indeed, the trial court pointed out, when Berger was deposed, he was unable to testify regarding how or through whom Calvary's contract with Patel was negotiated if not through O'Connor. While the contract contained an Ohio choice-of-law provision, and Patel's performance of the contract was to be nationwide, the trial court reasoned that "using an Illinois resident to specifically target, negotiate[,] and hire another Illinois resident away from an Illinois corporation and competitor seems like just the sort of purposeful availment required to satisfy the Due Process minimum contacts requirement."

¶ 34    The trial court also held that Coral had established sufficient minimum contacts based upon the planning or commission of a tortious act by Calvary impacting an Illinois corporation. Coral alleged that the scheme to steal Coral's trade secrets and violate Patel's agreements with Coral was formed during a meeting between O'Connor and Patel in Illinois. An internal e-mail from Berger during this time period stated, "I think the value [Patel] offers is the account locations and dollar amounts ****." The trial court found that the e-mail was "presumably [] a reference to potential customers." The trial court further found that, contrary to Berger's attestation that Calvary was never provided with Coral's trade secrets, "a forensic search of Patel's laptop computer suggests that several allegedly proprietary documents developed by or at Coral had been modified and stored on Patel's laptop with only the heading and other minor changes made to rebrand the documents as Calvary documents." The parties disputed whether the documents were trade secrets, but, the trial court noted, the issue was at the heart of the case's merits and its resolution was unnecessary to resolve the limited issue of personal jurisdiction. Rather, the trial court reasoned, "[a]ssuming as the Court must for purpose of the pending motion, that Patel's rebranding and reuse of these documents was improper and amounts to evidence of the misappropriation of Coral's trade secrets for the benefit of Calvary, these are documents created by an Illinois resident (presumably in Illinois) purposefully directed to harm the competitive interests of an Illinois corporation." Accordingly, the trial court reasoned, "based on the allegations and documents, Calvary intended to benefit from the misuse of Coral trade secrets and the violation of Patel's agreements with Coral—all at the expense of Coral."

¶ 35    Having determined that Calvary had sufficient minimum contacts with Illinois to satisfy due process, the trial court proceeded to hold that exercising jurisdiction over Calvary comported with traditional notions of fair play and substantial justice. The trial court noted that Calvary did

not argue otherwise and "admittedly does business across the country" such that it would be no greater burden to defend the claims in Illinois than Coral would face in litigating the claims in Ohio. The trial court added that Illinois has an interest in providing an allegedly injured resident with redress and that it would be more convenient for the litigation to proceed against both defendants in the same forum. Given the dismissal of the declaratory judgment action in Ohio, the trial court concluded that the "Ohio courts seem to acknowledge that Ohio has no particular interest at stake in this litigation."

¶ 36    In sum, the trial court concluded that Coral established a *prima facie* case for personal jurisdiction over Calvary in Illinois and that Calvary did not overcome this showing with uncontradicted counterevidence. The trial court noted that discovery had touched on the merits of Coral's claims but stated that it was "explicitly not making any findings or determinations concerning the merits of any of Coral's claims." Rather, its holding was strictly limited to the determination that there was a sufficient basis for its exercise of personal jurisdiction over Calvary. Accordingly, the trial court denied Calvary's motion to dismiss the verified third amended complaint.

¶ 37    We granted Calvary's petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(3) (eff. Oct. 1, 2019).

¶ 38                                      II. ANALYSIS

¶ 39    The plaintiff bears the burden of establishing a *prima facie* basis to assert personal jurisdiction over a nonresident defendant. *Aspen American Insurance Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281 ¶ 12. In disposing of a motion to dismiss for lack of personal jurisdiction, "the court shall consider all matters apparent from the papers on file in the case, affidavits submitted by any party, and any evidence adduced upon contested issues of fact." 735

ILCS 5/2-301(b) (West 2014). Where, as here, the trial court resolves a motion to dismiss for lack of personal jurisdiction based solely on documentary evidence, our review is *de novo*. *Aspen*, 2017 IL 121281, ¶ 12. "[A]ny conflicts in the pleadings and supporting affidavits will be resolved in the plaintiff's favor but uncontradicted evidence offered by the defendant may defeat jurisdiction." *Id.*; see also *Zamora v. Lewis*, 2019 IL App (1st) 181642, ¶ 42 (in considering the issue of personal jurisdiction, "[a]ny unrebutted allegations must be accepted as true [citation omitted], but any conflicts in the supporting documentation must be resolved in the plaintiff's favor [citation omitted]").

¶ 40 Our state's long-arm statute authorizes Illinois courts to exercise jurisdiction over nonresident defendants. 735 ILCS 5/2-209 (West 2014); *Aspen*, 2017 IL 121281, ¶ 13. Section 2-209(a) of the statute enumerates actions that subject a nonresident defendant to jurisdiction, including the "making or performance of any contract or promise substantially connected with this State" and the "commission of a tortious act within this State." 735 ILCS 5/2-209(a)(2), (7) (West 2014). However, section 2-209(c) of the long-arm statute also allows an Illinois court to exercise jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2014). Thus, " 'the long-arm statute is satisfied when due process concerns are satisfied, regardless of whether the defendant performed any of the acts enumerated in the long-arm statute.' " *McNally v. Morrison*, 408 Ill. App. 3d 248, 256 (2011) (quoting *Keller v. Henderson*, 359 Ill. App. 3d 605, 612 (2005)). Nevertheless, the due process analysis focuses on the defendant's conduct. *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 12. The enumerated actions set forth in section 2-209(a) of the long-arm statute, therefore, may provide footing for the determination of whether a nonresident defendant's contacts

are sufficient to satisfy due process. *Capra v. Lipschultz*, 2020 IL App (1st) 192160, ¶ 22*; Aasonn*, 2011 IL App (2d) 101125, ¶ 12.

¶ 41    Initially though, we must discuss the scope of the due process analysis. See *Aspen*, 2017 IL 121281, ¶ 13; *Russell v. SNFA*, 2013 IL 113909, ¶¶ 31-33. The due process guarantee contained in the Illinois Constitution (Ill. Const. 1970, art. I, § 2) contains an independent guarantee of due process distinct from its federal counterpart. *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990). Illinois due process demands that jurisdiction over a nonresident defendant be asserted only " 'when it is fair, just, and reasonable to require [the] nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois.' " *Id.* However, "it is generally true that, when federal due process concerns regarding personal jurisdiction are satisfied, so are Illinois due process concerns." *Aasonn*, 2011 IL App (2d) 101125, ¶ 13. Calvary makes no argument otherwise. Accordingly, we may confine our analysis to consideration of federal constitutional principles. See *Aspen*, 2017 IL 121281, ¶ 13.

¶ 42    Federal due process requires that a nonresident defendant have certain "minimum contacts" with Illinois "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citation.]" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The determination of whether the minimum-contacts test has been satisfied depends upon the category of personal jurisdiction asserted—general or specific jurisdiction. *Aasonn*, 2011 IL App (2d) 101125, ¶ 14. A state court has general jurisdiction over a nonresident corporate defendant when the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations v. Brown*, 564 U.S. 915, 919 (2011)); *Aspen*,

2017 IL 121281, ¶ 16. General jurisdiction is not at issue in this appeal, as Coral neither advanced the argument in the trial court nor raises it here.

¶ 43 An Illinois court may assert specific jurisdiction over a nonresident defendant where the defendant had sufficient minimum contacts with Illinois such that there was fair warning that it might be haled into an Illinois court; the action arose out of or was related to the defendant's contacts with Illinois; and it is reasonable to require the defendant to litigate in Illinois. *Aasonn*, 2011 IL App (2d) 101125, ¶ 14. The minimum contacts must be based upon an act by which the nonresident defendant purposefully availed itself of the privilege of conducting activities within Illinois, thereby invoking the benefits and protections of Illinois laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The purposeful-availment requirement ensures that an out-of-state defendant will not be forced to litigate in a "distant or inconvenient forum solely as a result of random, fortuitous, or attenuated contacts or the unilateral act of a consumer of some other third person." *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 24. The focus is on the nonresident defendant's activities within the forum state, not on the plaintiff's activities. *Id.* ¶ 29.

¶ 44 Before turning to the merits, we address Calvary's contention that the arguments in Coral's brief should be deemed forfeited for failure to provide proper citation to the documentary evidence in violation of Illinois Supreme Court Rule 341(h)(7) and 341(i) (eff. May 25, 2018). While there are instances of failure to provide proper record citation, Coral's brief is not so deficient as to hinder our review. We therefore decline to deem Coral's arguments forfeited. See *Carter v. Carter*, 2012 IL App (1st) 110855, ¶ 12.

¶ 45 The crux of Calvary's argument is that Coral failed to establish that Calvary had sufficient minimum contacts with Illinois to satisfy due process. Subsumed in the argument, however, are

broad assertions regarding the documentary evidence upon which the trial court relied. We address these assertions first.

¶ 46                                    A. Documentary Evidence

¶ 47    Calvary raises a blanket argument that reversal is warranted because Coral failed to submit a counteraffidavit in response to Berger's affidavits. Calvary cites the general principle of law that "where well-alleged facts within an affidavit are not contradicted by counteraffidavits, they must be taken as true notwithstanding the existence of contrary averments in the adverse party's pleadings*." Professional Group Travel, Ltd. v. Professional Seminar Consultants, Inc.*, 136 Ill. App. 3d 1084, 1089 (1985). In other words, "[i]f a defendant's affidavit contesting jurisdiction is not refuted by a counteraffidavit filed by the plaintiff, the facts alleged in the defendant's affidavit are accepted as true." *Id.* (citing *Doolin v. K-S Telegage Co.*, 75 Ill. App. 3d 25, 29 (1979); *Wiedemann v. Cunard Line Ltd.*, 63 Ill. App. 3d 1023, 1031 (1978)).

¶ 48    Calvary is correct that Coral did not submit a counteraffidavit in response to Berger's affidavits. But the consequence of this is not a matter that may be addressed in a vacuum. "[T]he defendants' affidavit will be determinative of the motion only if it negates facts upon which the plaintiff bases jurisdiction because otherwise, the defendant has not effectively controverted plaintiff's *prima facie* showing that the defendant has submitted to the jurisdiction of Illinois." *Doolin*, 75 Ill. App. 3d at 29. For instance, in *Doolin*, the plaintiff's failure to submit a counteraffidavit did not warrant dismissal because the affidavit submitted by the defendant in support of its motion to dismiss the plaintiff's complaint for lack of personal jurisdiction disregarded pivotal jurisdictional allegations in the complaint. *Id.* at 29-30. Likewise, here, as counsel for Calvary acknowledged during oral argument, the mere absence of a counteraffidavit from Coral is not dispositive. The question is whether Berger's affidavits negated facts upon which

Coral based its *prima facie* showing of jurisdiction. As set forth below, we examine this issue in the full context of the record, keeping in mind that conflicts in the pleadings and supporting documentary evidence must be resolved in Coral's favor in determining whether a *prima facie* basis to assert personal jurisdiction was established. See *Aspen*, 2017 IL 121281, ¶ 12.

¶ 49 Calvary also argues that, rather than accepting Berger's attestations as true, the trial court improperly relied upon the exhibits that Coral submitted—"many of which are inadmissible hearsay, ranging from e-mails to PowerPoint presentations." However, a review of the record reflects that Calvary never objected on hearsay grounds to the exhibits. Rather, Calvary argued that the exhibits pertained to the merits of the case and should not be considered on the issue of personal jurisdiction. Significantly, too, contrary to the argument that the exhibits were irrelevant, Calvary cited a portion of O'Connor's e-mails to support its argument that O'Connor never discussed Coral's accounts or products with Patel. Moreover, Calvary fails to provide any particularity or legal analysis to support its argument. Accordingly, the argument is forfeited. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 350 (2010) ("A party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on."); *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) (a "reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented" and is not obliged to "act as an advocate or search the record for error"). Regardless, to the extent Calvary argues generally that the trial court was required to credit Berger's attestations over the exhibits, again, we address this issue below in the full context of the record and appropriate standard. See *Aspen American Insurance*, 2017 IL 121281, ¶ 12.

¶ 50     As a final matter, Calvary challenges the admission of Dority's purported declaration. Calvary argues that the exhibit was not admissible because it neither stated that it was based upon personal knowledge nor included a certification pursuant to section 1-109 of the Code (735 ILCS 5/1-109 (West 2018)). Section 1-109 provides in relevant part that the certification of a document pursuant to the statute shall be in substantially the following form: "Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he [or she] verily believes the same to be true." *Id.* Dority's purported declaration did not contain the requisite certification. Thus, we disregard the declaration.

¶ 51     We turn to the heart of the argument—whether the exercise of personal jurisdiction over Calvary comports with due process.

¶ 52                              B. Minimum Contacts

¶ 53     Calvary argues that the trial court erroneously determined that its contractual relationship with Patel established the requisite minimum contacts. A contract with an Illinois resident, standing alone, does not automatically establish sufficient minimum contacts to satisfy due process. *Cardenas Marketing Network, Inc. v. Pabon*, 2012 IL App (1st) 111645, ¶ 36; see also *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). Rather, relevant considerations may include who initiated the transaction, where the contract was formed, and where the contract was to be performed. *Graver v. Pinecrest Volunteer Fire Department*, 2014 IL App (1st) 123006, ¶ 16. "Because the formation of a contract represents an intermediate step linking prior negotiations

with future consequences, the court should also consider other relevant circumstances such as the parties' prior negotiations, the contemplated future consequences, the terms of the contract, and the parties' actual course of dealing." *Aasonn*, 2011 IL App (2d) 101125, ¶ 16 (citing *Burger King*, 471 U.S. at 479). A choice-of-law provision in the contract is relevant, but not dispositive. *Graver*, 2014 IL App (1st) 123006, ¶ 16.

¶ 54    We note that these considerations are not a perfect fit. With exception, the cases to which the parties cite involve whether a contractual relationship between the plaintiff and the nonresident defendant established the requisite minimum contacts. See, *e.g.*, *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334; *Aasonn*, 2011 IL App (2d) 101125; but see, *e.g.*, *Wiggen*, 2011 IL App (2d) 100982. Here, there was no contractual relationship between the plaintiff (Coral) and the nonresident defendant (Calvary). Rather, the contract at issue was the contract between a resident defendant (Patel) and his nonresident codefendant (Calvary). Nevertheless, as noted above, the determination of whether the exercise of personal jurisdiction over a nonresident defendant comports with due process is not confined to a formulaic analysis. The focus is on the nonresident defendant's conduct. See *Aasonn*, 2011 IL App (2d) 101125, ¶ 12. Accordingly, with the foregoing considerations in mind, we turn to Calvary's conduct.

¶ 55    While Patel's agreement with Calvary contained an Ohio choice-of-law provision, other relevant considerations inform the analysis. Calvary's position is that Patel initiated discussions with Calvary about an employment relationship. However, Patel testified in no uncertain terms, "I didn't reach out to Calvary. Calvary called me." Patel elaborated, "O'Connor called me that he's interested to hire me." Calvary cites O'Connor's testimony and the statements in Berger's first affidavit that O'Connor and Patel had been close colleagues and friends for many years and that any communication was in that capacity. But this evidence did not dispute Patel's testimony that

O'Connor initiated the transaction. And even if we were to view O'Connor's testimony and Berger's affidavit as contradictory to Patel's testimony, we are required to resolve the conflict in Coral's favor in this procedural posture. See *Aspen*, 2017 IL 121281, ¶ 12. Thus, based on the record, Coral made a sufficient showing that Calvary, through O'Connor (an Illinois resident), reached out and initiated the contact with Patel (an Illinois resident) in Illinois.

¶ 56 Nonetheless, Calvary points out, Austin Morelock signed the agreement on Calvary's behalf in Ohio the day after Patel signed the agreement. " '[T]he place where the last act necessary to give validity to the contract is done is the place where the contract is made.' " *Ideal Insurance Agency, Inc. v. Shipyard Marine, Inc.*, 213 Ill. App. 3d 675, 681 (1991) (quoting *Youngstown Sheet & Tube Co. v. Industrial Comm'n*, 79 Ill. 2d 425, 433 (1980)). Thus, Calvary argues, its agreement with Patel was formed in Ohio where the last act necessary to effectuate the validity of the contract—the signature of Austin Moreland—was performed.

¶ 57 Calvary's argument disregards the preceding contract negotiations. Based upon the record and resolving any conflicts in Coral's favor, Patel met with O'Connor twice in Lake County in June 2015 for the purpose of negotiating an employment agreement with Calvary. While Berger attested that John Morelock and Austin Morelock were the only individuals at Calvary with authority to negotiate employment contracts or make employment offers, he acknowledged that he did not discuss with them whether they negotiated the terms of Patel's employment contract and did not explain through whom Patel's contract was negotiated. The documentary evidence provided the detail. O'Connor's July 27, 2015, e-mail correspondence reflected that he was negotiating with Patel. O'Connor sent John Morelock and Austin Morelock the terms of a proposed agreement, stating "[t]his covers what I have agreed with [Patel]." O'Connor sent Patel an offer letter, stating "[t]his should outline what we agreed to." A Calvary employee e-mailed the

proposed agreement to O'Connor with a copy to John Morelock and Austin Morelock, requesting O'Connor to "review and forward to [Patel] if this meets our needs," [as] "I've incorporated your terms into our standard agreement." O'Connor forwarded the proposed agreement to Patel for Patel to sign in Illinois. Calvary failed to rebut that O'Connor, an Illinois resident, was Calvary's primary contact with Patel during the contract negotiations—negotiations that included face-to-face meetings in Illinois.

¶ 58 We also note that while the territory set forth in Patel's consulting agreement was the North Central Americas, Patel, of course, was an Illinois resident. In the July 27, 2015, e-mail from O'Connor to John Morelock and Austin Morelock, setting forth the terms of the agreement, O'Connor proposed that Patel come to Calvary in two weeks "to work on products and how he will handle testing for us at his house." This correspondence suggests that Patel would be performing at least some of his obligations at his home in Illinois. Moreover, Calvary did not submit uncontroverted evidence to dispute Coral's allegation that, during Patel's employment with Calvary, he continued to report to O'Connor and work primarily from his home in Illinois. Accordingly, the record demonstrates that Coral established the requisite minimum contacts based upon Calvary's making of a contract substantially connected with Illinois.

¶ 59 Calvary also argues that the trial court erroneously determined that its commission of a tortious act in Illinois established the requisite minimum contacts. To assert personal jurisdiction based upon a defendant's tortious conduct in Illinois, the plaintiff must allege that the defendant performed a tortious act or omission and caused an injury in Illinois. *Aasonn*, 2011 IL App (2d) 101125, ¶ 16. Where, as here, the purported injury is economic rather than physical or emotional, the plaintiff must also allege facts demonstrating that the defendant intended to affect an Illinois interest. *Id.* "This intent requirement mirrors the purposeful-availment requirement." *Id.*

¶ 60 Calvary likens this case to *Arthur Young & Company v. Bremer*, 197 Ill. App. 3d 30, 36 (1990), in which Arthur Young alleged that one of the defendants committed a tortious act in Illinois by aiding and abetting Arthur Young's former employee to breach his contractual employment obligations. The defendant testified that he contacted the former employee from Illinois by telephone regarding possible employment, although they did not discuss salary or job responsibilities. *Id.* at 37. The appellate court held that there was no basis for personal jurisdiction based upon the commission of a tortious act in Illinois. *Id.* The inquiry regarding a job was not "encouragement to [the former employee] to breach a pre-existing employment agreement." *Id.* Thus, "no contact which [the defendant] had with Illinois is related to the alleged tortious conduct." *Id.*

¶ 61 Arthur Young also alleged that another defendant's phone calls from Illinois to a former employee regarding employment in California resulted in aiding and abetting a breach of contractual employment obligations and tortious interference with prospective business advantage. *Id.* at 37-38. The appellate court likewise held that there was no basis for the exercise of personal jurisdiction, as the statements in Illinois were not the tort. *Id.* at 38. Rather, quoting the trial court's rationale, the appellate court reasoned the alleged tort was " 'going to work for these people [name of new employer]" *** [a]nd that didn't take place in Illinois.' " *Id.*

¶ 62 *Arthur Young* is inapposite. Coral does not maintain that mere statements in Illinois regarding possible employment amounted to a tortious act. Coral asserted personal jurisdiction based upon an alleged scheme between Patel and Calvary, devised in Illinois, whereby Patel would violate the terms of his employment agreements with Coral for the purpose of advancing Calvary's interests and receive payment from Calvary for information regarding Coral's accounts and proprietary information. Berger attested that Calvary never offered to pay Patel conditioned upon

receipt of information about Coral's accounts, trade secrets, and confidential information. Yet Berger wrote in a July 20, 2015, e-mail to Calvary principals that "the value [Patel] offers is the account locations and dollar amounts, as well as the know-how." While Berger testified that Patel never told him about any accounts, Berger also testified that "account locations" was a reference to "industry contacts" and that "dollar amounts" was a reference to the worth of a customer's "process."

¶ 63 Moreover, in addition to the alleged scheme, Coral asserted a transfer in Illinois of its trade secrets and confidential information to Calvary. Coral relied upon evidence that its PowerPoint presentation regarding wastewater treatment was rebranded for Calvary's purposes. Berger, however, attested that he never saw, received, or viewed the presentation and that to his knowledge, the presentation was not distributed to Calvary staff. But Coral also relied upon the proprietary nature of the wastewater jar-testing procedures that Patel sent to Calvary employees. While Berger attested that the jar-testing procedures are in the public domain, we agree with the trial court that this issue lies at the heart of the merits of the case and is an issue with which we are not tasked with resolving.

¶ 64 Regardless, Calvary maintains, for purposes of the tort provision of the long-arm statute, the place of the wrong is the place where the last event necessary to hold the actor liable takes place. See *id.* at 36. According to Calvary, "assuming *arguendo* that Patel sent [Coral's] formulas and forms to [Calvary], which he did not, [Calvary] would have received those formulas and forms in Ohio, not Illinois." Thus, Calvary argues, jurisdiction was not proper in Illinois. However, as Coral points out, this "analysis makes no sense" in this case, as this would allow a party to "steal a competitor's trade formulas and trade secrets and mail them to the jurisdiction they deem to be

most advantageous." Accordingly, the record demonstrates that Coral further established the requisite minimum contacts based upon the alleged commission of a tortious act in Illinois.

¶ 65    Calvary nevertheless argues that the trial court improperly resolved material conflicts in the supporting documentation without an evidentiary hearing in determining that minimum contacts were established. See *Madison Miracle*, 2012 IL App (1st) 112334, ¶ 35 ("If any material evidentiary conflicts [with respect to the exercise of personal jurisdiction] exist, however, the trial court must conduct an evidentiary hearing to resolve those disputes."). According to Calvary, had the trial court conducted an evidentiary hearing, "its improper reliance on [Coral's] pleadings and papers could have been argued by [Calvary], and had Illinois law been properly followed, Berger's [f]irst and [s]econd [a]ffidavits would have resulted in the dismissal of the case."

¶ 66    However, Calvary did not request an evidentiary hearing in the briefing on its motion to dismiss the verified amended third amended complaint. And, at the outset of the oral argument on the motion, the trial court explicitly inquired as to whether an evidentiary hearing was required. Calvary neither responded to the question nor requested an evidentiary hearing. Rather, Calvary acknowledged that "disputes in terms of which set of facts is correct" must be resolved in Coral's favor. Likewise, on appeal, the only relief Calvary seeks is a remand for outright dismissal of the case. Calvary does not request an evidentiary hearing. Moreover, Calvary fails to specify the material conflicts upon which the trial court should have held any evidentiary hearing. Accordingly, its argument that the trial court erred in failing to conduct an evidentiary hearing is forfeited. See *Village of South Holland v. Calumet Auto Truck Plaza*, 197 Ill. App. 3d 49, 51-52 (1990).

¶ 67    In any event, as set forth above, the trial court properly determined that Coral established a *prima facie* basis for the exercise of jurisdiction over Calvary and that Calvary failed to overcome

this showing with uncontradicted evidence to defeat jurisdiction. An evidentiary hearing was not required. The trial court pointed out that the parties' discovery on the issue of personal jurisdiction became enmeshed with the merits of the underlying claims. But the trial court properly limited its determination to the question of whether personal jurisdiction over Calvary comported with due process. See 735 ILCS 5/2-301(b) (West 2014) ("No determination of any issue of fact in connection with the objection [to the court's exercise of personal jurisdiction] is a determination of the merits of the case or any aspect thereof."). We too make no determination as to the merits of the underlying cause of action. In sum, having reviewed the verified third amended complaint, deposition testimony, affidavits, and exhibits, and resolving any conflicts in the supporting documentation in Coral's favor, we hold that Coral established a *prima facie* basis to assert personal jurisdiction and that Calvary did not present uncontradicted evidence to overcome this showing. See *Aspen*, 2017 IL 121281, ¶ 12.

¶ 68                          C. Fair Play and Substantial Justice

¶ 69     Having determined that Calvary had sufficient minimum contacts in Illinois to satisfy due process, we must proceed to determine whether the exercise of personal jurisdiction over Calvary comports with traditional notions of fair play and substantial justice. "A court may evaluate the burden on the defendant to litigate in the forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in convenient and effective relief, and the interstate judicial system's interest in the most efficient resolution of a controversy." *Aasonn*, 2011 IL App (2d) 101125, ¶ 25 (citing *Burger King*, 471 U.S. at 477). A nonresident defendant that purposefully directed its activities at forum residents is required to set forth a "compelling case" to defeat jurisdiction. *Id.* (citing *Burger King*, 471 U.S. at 477).

¶ 70    Calvary raises no argument, much less a compelling one, that jurisdiction is defeated based upon traditional notions of fair play and substantial justice. Illinois has an interest in providing a means of redress for its injured resident and in ensuring consistent enforcement of Illinois law, including the Illinois Trade Secrets Act. See *Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.") [Citation omitted]. The record also demonstrates that Calvary conducts business nationwide. Any burden on Calvary to litigate in Illinois would not exceed the burden on Coral to litigate in Ohio.

¶ 71    Moreover, Patel—Cavalry's codefendant—is an Illinois resident. Litigation of Coral's claims against both Patel and Calvary in the same forum promotes efficient resolution of the controversy. In this regard, we note the Ohio trial court's rationale in dismissing Calvary's declaratory judgment action (the dismissal of which was affirmed on appeal) that the resolution of the underlying dispute may require testimony from witnesses who reside in Illinois and have no ties to Ohio. Accordingly, the entirety of the record demonstrates no basis upon which to conclude that requiring Calvary to litigate in Illinois would offend traditional notions of fair play and substantial justice.

¶ 72                            III. CONCLUSION

¶ 73    The judgment of the circuit court of Lake County is affirmed.

¶ 74    Affirmed.